237 F.3d 111 (2nd Cir. 2000)
 JULIANNE EISENBERG, Plaintiff-Appellant,
v.
ADVANCE RELOCATION & STORAGE, INC., ADVANCE RELOCATION &AMP; STORAGE OF CONNECTICUT, INC., WHEATON WORLD WIDE MOVING, B. NILSSON MOVING AND STORAGE, INC., and MOLLOY BROTHERS MOVING AND STORAGE COMPANY, Defendants-Appellees.
 Docket No. 00-7216
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: September 13, 2000
Decided: December 26, 2000
 
 Appeal from a judgment of the United States District Court for the Southern District of New York (William C. Conner, Judge) granting defendants' motion for summary judgment and dismissing the complaint on the ground that plaintiff was not an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-2, et seq. ("Title VII") and New York Human Rights Law, Exec. Law §§ 290, et seq. ("NYHRL"). We hold that, in determining whether a worker is an employee within the meaning of Title VII and the NYHRL, courts ordinarily should place particular weight on the extent to which the hiring party controls the manner and means by which the worker completes her assigned tasks, rather than on how she is treated for tax purposes or whether she receives benefits.
 Reversed and remanded.
 
 
 1
 DANIEL J. SCHNEIDER, Newburgh, NY, for Plaintiff-Appellant.
 
 
 2
 VINCENT TOOMEY, Lake Success, NY, for Defendants-Appellees.
 
 
 3
 BARBARA L. SLOAN, Equal Employment Opportunity Commission, Office of General Counsel, Washington, DC, for Amicus Curiae Equal Employment Opportunity Commission.
 
 
 4
 Before: CABRANES and PARKER, Circuit Judges, and CEDARBAUM, District Judge.*
 
 JOSE A. CABRANES, Circuit Judge:
 
 5
 We consider the question of whether the plaintiff is an "employee" within the meaning of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-2, et seq. ("Title VII"), and New York Human Rights Law, Exec. Law §§ 290, et seq. ("NYHRL"). We hold that, in determining whether a worker is an employee within the meaning of Title VII and the NYHRL, courts ordinarily should place particular weight on the extent to which the hiring party controls the manner and means by which the worker completes her assigned tasks, rather than on how she is treated for tax purposes or whether she receives benefits. Accordingly, we reverse the judgment of the District Court and remand for further proceedings.
 
 I.
 
 6
 Unless otherwise noted, the following facts are not disputed. In July 1998, Julianne Eisenberg ran into an old acquaintance, Peter White, who was accompanied by another man, Mike Ewing. Both men worked at Advance Relocation & Storage, Inc. ("Advance"), a Danbury, Connecticut warehouse-White was involved in Advance's hiring process, and Ewing was the warehouse manager. The men discussed with Eisenberg the possibility of her working on a "permanent full-time" basis at Advance. They did not inquire into any special skills that Eisenberg may have had, and they did not ask about her prior work experiences. Instead, Eisenberg believed, the men were interested in her working at the warehouse because White knew that she was strong, having played football with her, and that she had been doing "carpentry work" for many years.
 
 
 7
 Soon after her conversation with White and Ewing, Eisenberg reported for work at Advance. There, she and her co-workers were responsible for loading and unloading furniture from trucks at the warehouse and at residences. They were paid on an hourly basis, and were required to punch in and out. Eisenberg and her co-workers were occasionally sent home early if there was little to do, and they were sometimes asked to work on the weekend.
 
 
 8
 At the warehouse, "Pete was [the] boss"-he gave Eisenberg "orders," and if he was not going to be at the warehouse on a particular day, he told her on the prior day "where ... to go and what ... to do." At job sites, an Advance representative-White, Ewing, or someone else-"would direct the crew as to what objects each [crew member, including Eisenberg,] was to move."
 
 
 9
 Eisenberg claims that during much of the time that she worked at Advance, she was sexually harassed. She asserts that on September 16, 1998, she complained about this alleged sexual harassment to Joan Isaacson, the Advance office manager; Eisenberg also alleges that she told Isaacson that she had seen several Advance employees using cocaine in the warehouse.
 
 
 10
 The warehouse was closed by management the next day. Eisenberg then met again with Isaacson, at which point Isaacson allegedly told her that she would receive a job when the warehouse re-opened, and would be contacted and told when to return to work. Isaacson then assertedly advised Eisenberg that she would not receive a job at Advance if, based on her allegations of sexual harassment, she sought legal counsel or filed a complaint. Undeterred, Eisenberg hired an attorney and initiated this action. She claims that she has not been called by Issacson or anyone else at Advance regarding a position at the firm.
 
 
 11
 Eisenberg's complaint alleges that she was subjected to a hostile work environment at Advance, that her termination from the firm was discriminatory, and that defendants retaliated against her for complaining about the violation of her right to be free of sexual harassment-all in violation of Title VII and the NYHRL. Following discovery, defendants moved for summary judgment, and the District Court granted their motion, holding that Eisenberg was not an Advance "employee," and thus could not invoke the protections of Title VII or the NYHRL. See Eisenberg v. Advance Relocation and Storage, Inc., 82 F. Supp. 2d 241 (S.D.N.Y. 2000). Judgment was entered accordingly, and this timely appeal followed.
 
 II.
 A.
 
 12
 Title VII and the NYHRL cover "employees," not independent contractors. See O'Connor v. Davis, 126 F.3d 112, 115 (2d Cir. 1997) (Title VII); Scott v. Massachusetts Mut. Life Ins. Co., 633 N.Y.S.2d 754, 756 (1995) (the NYHRL). For the purposes of these statutes, a decision on whether a worker is an "employee"-or whether he or she is merely an independent contractor-requires the application of the common law of agency. See O'Connor, 126 F.3d at 115 (Title VII); Tagare v. Nynex Network Sys. Co., 994 F. Supp. 149, 159 (S.D.N.Y. 1997) (the NYHRL) (collecting New York cases). In turn, whether a hired person is an employee under the common law of agency depends largely on the thirteen factors articulated by the Supreme Court in Community for Creative Non Violence v. Reid, 490 U.S. 730 (1989).[1] See O'Connor, 126 F.3d at 115; Tagare, 994 F. Supp. at 159 (noting that the factors consulted to determine whether a hired party is an employee under the NYHRL "largely mirror those weighed in Title VII claims") (collecting cases). These so-called "Reid factors," which are culled from the federal common law of agency, see Reid, 490 U.S. at 740-41, are as follows:
 
 
 13
 [1] the hiring party's right to control the manner and means by which the product is accomplished ... [;] [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.
 
 
 14
 Id. at 751-52 (footnotes omitted).
 
 
 15
 In balancing the Reid factors, a court must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of "indeterminate" weight-that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either the conclusion that the worker is an employee or the conclusion that he or she is an independent contractor. See Aymes v. Bonelli, 980 F.2d 857, 861, 863 (2d Cir.1992); see also Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 110-111 (2d Cir.1998) ("Not all the Reid factors will be significant in every case, and we must weigh in the balance only those factors that are actually indicative of agency in the particular circumstances before us.").
 
 
 16
 The court is then required to assess each of the remaining factors. Though no single factor is dispositive, see Reid, 490 U.S. at 752, the "greatest emphasis" should be placed on the first factor-that is, on the extent to which the hiring party controls the "manner and means" by which the worker completes his or her assigned tasks. See Frankel, 987 F.2d at 90 (noting that "under the common law agency test" outlined in Reid, the "greatest emphasis" is placed "on the hiring party's right to control the manner and means by which the work is accomplished").[2] The first factor is entitled to this added weight because, under the common law of agency, "an employer employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the 'manner and means' by which the purported employee brings about that result." Hilton Int'l Co. v. NLRB, 690 F.2d 318, 320 (2d Cir. 1982); see Railroad Co. v. Hanning, 82 U.S. (15 Wall.) 649, 657-58 (1872) (collecting cases and authorities that apply this "control" rule); Performing Right Soc'y, Ltd. v. Mitchell and Booker, Ltd., [1924] 1 K.B. 762 (collecting 19th and early 20th century English cases that apply the rule and treatises that describe it); Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 260 (4th Cir. 1997) ("At root, the distinction at common law between an employee and an independent contractor rests on the degree of control exercised by the hiring party."); Frankel, 987 F.2d at 89 (observing that the "traditional test" for determining whether a worker is an employee of independent contractor "focuses primarily on the hiring party's right to control the manner and means by which the product is accomplished") (internal quotation marks and citations omitted); Local 777, Democratic Union Org. Comm. v. NLRB, 603F.2d 862, 874 (D.C. Cir. 1978) ("Control exercised over the 'manner and means of performance,' ...is the identifying characteristic of an employer/employee relationship."); In re Morton, 284 N.Y. 167, 172 (1940) (applying the "general concept" that the distinction between an employee and an independent contractor turns on "the right of control over the [worker] in respect of the manner in which his work is to be done"); see also RESTATEMENT (SECOND) OF AGENCY §220(1) cmt. d (1958) (stating that "control or right to control the physical conduct of the person giving service is important and in many situations is determinative" of whether that person is an employee or independent contractor); WARREN A. SEAVY, AGENCY §84, at 142 (1964) (observing that "the right to control the physical movements of the employee is [typically] the most important single element"); cf. Tieberg v. Unemployment Ins. Appeals Bd., 471 P.2d 975, 980, 982 (Cal. 1970) (holding that "[t]he right to control the means by which the work is accomplished is clearly the most significant test of the employment relationship" and observing that many of the other factors enumerated in the Restatement (Second) "are merely evidentiary indicia of the right to control").
 
 B.
 
 17
 The District Court's determination as to "the presence or absence" of each Reid factor is a finding of fact which we review for clear error. Aymes, 980 F.2d at 860-61. The District Court's "ultimate determination" as to whether a worker is an employee or an independent contractor-that is, the District Court's balancing of the Reid factors-is a question of law which we review de novo. Id. at 861.
 
 
 18
 At oral argument, the parties informed us that they do not object to the District Court's factual findings. Rather, the parties dispute only the conclusions that the District Court drew from the facts that it found, and its ultimate balancing of the Reid factors. Accordingly, our review of the District Court's judgment is both limited and de novo.
 
 C.
 
 19
 The District Court did not place the "greatest emphasis" on the first Reid factor, as required. Rather, it noted that in Aymes v. Bonelli, a work-for-hire copyright case,[3] we "relied heavily" on two of the Reid factors-namely, the "employee benefits" factor (number 12) and the "tax treatment" factor (number 13). See Eisenberg, 82 F. Supp. 2d at 246. Taking a perceived cue from Aymes's emphasis on these factors, the District Court held that Eisenberg, who did not receive benefits and was not treated as an employee for tax purposes, was an independent contractor. We disagree.
 
 
 20
 Aymes does indeed emphasize the presumptive significance of five of the Reid factors, including those related to benefits and tax treatment. However, we have never applied this weighing of the Reid factors outside of the copyright context, and we decline to do so here because of an important difference between the work-for-hire doctrine and anti-discrimination law.
 
 
 21
 Were Reid's benefits and tax treatment factors accorded extra weight, as they were in Aymes, a firm and its workers could all but agree for themselves, simply by adjusting the structure of workers' compensation packages, whether the workers will be regarded as independent contractors or employees. For example, workers who would otherwise be characterized as employees could accept a relatively larger salary in exchange for foregoing benefits and not having tax payments deducted from their wages. As the District Court's decision makes clear, in most such cases the employment contract's no-benefits and no-tax-deduction clauses would be decisive, and the workers would be regarded as independent contractors. Cf. J. Huizinga Cartage Co. v. NLRB, 941 F.2d 616, 620 (7th Cir. 1991) ("[I]f an employer could confer independent contractor status through the absence of payroll deductions there would be few employees falling under the protection of the [National Labor Relations] Act." (emphasis added)).
 
 
 22
 In the copyright context, such a result presents no difficulty. By contract, a worker and a firm may agree that the worker will or will not have intellectual property rights to items that she makes while working for the firm. See 17 U.S.C. §201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."). Such agreements are controlling regardless of whether, in their absence, a worker would be characterized as an employee or an independent contractor. Indeed, in copyright work-for-hire cases, the question of whether a worker is an employee or an independent contractor arises only after the court has determined that the parties did not agree on the allocation of intellectual property rights. See, e.g. Aymes, 980 F.2d. at 860 ("It is undisputed that [the worker] and [the firm] never signed a written agreement assigning ownership rights .. . . We must therefore consider whether the program was a work prepared by [the worker] as an employee within the scope of his employment." (emphasis added)). We interpret Aymes as standing for the proposition that a worker and a firm can enter into a contract that explicitly delineates who holds intellectual property rights to worker-created items, see 17 U.S.C. §201(b), and concomitantly a worker and a firm may by contract arrange the incidents of their particular relationship-whether benefits will be provided, how workers will be treated for tax purposes, etc.-in a way that substantially determines who holds the intellectual property rights to worker-created items.
 
 
 23
 While the rights to intellectual property can depend on contractual terms, see id., the right to be treated in a non-discriminatory manner does not depend on the terms of any particular contract. Rather, these "public law" rights were vested in workers as a class by Congress, and they are not subject to waiver or sale by individuals. See Barrentine v. Arkansas Best Freight Sys., Inc., 450 U.S. 728, 737-38 (1981) (describing Title VII as creating "nonwaivable, public law right[s]"); Alexander v. Gardner Denver Co., 415 U.S. 36, 51 (1974) ("[T]here can be no prospective waiver of an employee's rights under Title VII. ...Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. ... [W]aiver of these rights would defeat the paramount congressional purpose behind Title VII."). Accordingly, a firm cannot buy from a worker an exemption from the substantive protections of the anti-discrimination laws because workers do not have such an exemption to sell, and any contractual term that purports to confer such an exemption is invalid. Cf. Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1482 (D.C.Cir.1997) ("Clearly, it would be unlawful for an employer to condition employment on an employee's agreement to give up the right to be free from racial or gender discrimination. Any such condition of employment would violate Title VII[.]" (internal citations omitted)); Kendall v. Watkins, 998 F.2d 848, 851 (10th Cir. 1993) (explaining that an employee may not waive Title VII rights that have not yet accrued); EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 616 (9th Cir.1988) (similar). See generally McClure v. Salvation Army, 460 F.2d 553, 557 (5th Cir. 1972) ("[E]mployment contracts cannot be used to waive protections granted to employees by an Act of Congress." (citing J.I. Case Co. v. NLRB, 321 U.S. 332, 337 (1944))).
 
 
 24
 If Aymes's weighing of the Reid factors applied in the context of the anti-discrimination laws, workers and firms would be able to devise compensation packages that included a no-benefits clause and a no-tax-deductions clause, thereby all but insuring that workers are characterized as independent contractors, and permitting them to opt out of the anti-discrimination laws. See ante [at 9:5-16]. But the core, substantive protections of the anti-discrimination laws were not intended to be skirted by the terms of individual employment contracts-even if on their face those terms concern only the compensation of a worker. Cf. Spirides v. Reinhardt, 613 F.2d 826, 832 (D.C. Cir. 1979) (holding that, in determining whether a worker is an employee or an independent contractor, the District Court "rel[ied] principally, if indeed not entirely, on the contract language," and that doing so was error because, inter alia, "employment contracts, no matter what the circumstances that justify their execution or what the terms, may not be used to waive protections granted to an individual under [Title VII] or any other [A]ct of Congress").
 
 
 25
 In sum, the holding of Aymes-that the benefits and tax treatment factors deserve special consideration in determining whether a worker is an employee or independent contractor-may make sense in the copyright work-for-hire context because, under the copyright statute, workers and employers are free to allocate intellectual property rights by contract, but its wholesale importation into anti-discrimination law would allow workers and firms to use individual employment contracts to opt out of the anti-discrimination statutes. This is impermissible. Accordingly, we hold that in anti-discrimination cases such as this one, courts should not ordinarily place extra weight on the benefits and tax treatment factors enumerated in Reid, and should instead place special weight on the extent to which the hiring party controls the "manner and means" by which the worker completes her assigned tasks.
 
 D.
 
 26
 Turning to the individual Reid factors, it is plain that the fifth, seventh, and ninth factors must be disregarded. As to the fifth factor, it is not disputed that Eisenberg worked at Advance for only 28-35 days.[4] A relatively short tenure such as Eisenberg's ordinarily implies that a worker is an independent contractor. See Aymes, 980 F.2d at 864. Here, however, the brevity of Eisenberg's stint at Advance does not suggest much of anything-her job lasted only 28-35 days because of the closing of the warehouse, not because of the nature of her work or her relationship to Advance. As to the seventh factor, the District Court found that Eisenberg had "some" control over her schedule, but not full control over it. Because this ambivalent finding does not seem to cut in any particular direction, we disregard it. See ante at [5:25-6:3]. Finally, the ninth factor is irrelevant to this case: Eisenberg hired no one to assist her with her work at Advance, and Advance hired no assistants for Eisenberg. See Aymes, 980 F.2d at 861 ("[T]he factors relating to the authority to hire assistants will not normally be relevant if the very nature of the work requires the hired party to work alone. In such a case, that factor should be accorded no weight .. ..").
 
 
 27
 The remaining factors are the dispositive ones. As noted above, Eisenberg did not receive benefits such as medical insurance or vacation days, and Advance treated her as an independent contractor for tax purposes, giving her a "1090" tax form rather than a "W-2" form, and not deducting or withholding taxes from her wages. These factors favor characterizing Eisenberg as an independent contractor.
 
 
 28
 The remaining factors, however, suggest that Eisenberg was an Advance employee. As to the first factor, Advance exercised a great deal of control over the "manner and means" by which Eisenberg accomplished her assigned tasks. As we noted above, at the warehouse White gave Eisenberg "orders" on a daily basis; if he was not going to be at the warehouse on a particular day, he told her on the prior day "where ... to go and what ... to do." Moreover, at job sites, an Advance representative-White, Ewing, or someone else-"would direct the crew as to what objects each [crew member, including Eisenberg] was to move."
 
 
 29
 As to the second factor, Eisenberg's job at Advance-loading and unloading trucks-was not one that required relatively specialized skills. Other courts have held that the level of skill associated with being an architect, computer programmer, graphic artist, photographer, or treasurer suggests that workers who perform these jobs are independent contractors. See id. at 862 (collecting cases); Keller v. Niskayuna Consol. Fire Dist. 1, 51 F.Supp. 2d 223, 228 (N.D.N.Y. 1999). In terms of the level of skill that it required, Eisenberg's moving work was not analogous to any of these jobs. Indeed, in this case White and Ewing all but offered Eisenberg a job without first asking her about moving-related work that she had done in the past, or about relevant skills that she might have developed over the years. See ante at [3:4-5]. That White seemed to view Eisenberg as qualified for the job solely on the basis of her football and carpentry abilities, see ante at [3:6-8], only emphasizes the point: While simple moving of the sort Eisenberg performed certainly requires skills-strength, for example, and agility-it does not demand specialized skills of the sort typically acquired through experience and/or education.[5] See Aymes, 980 F.2d at 862 (holding that the "level of skill" involved in a computer programmer's work suggested that he was an independent contractor because "his programming demanded that he use skills developed while a graduate student ... and through his [work] experience").
 
 
 30
 As to the third and fourth factors, the District Court found that "Advance supplied all of the [necessary] instrumentalities," including "trucks and other supplies," and that "[t]he majority of plaintiff's work took place at Advance's warehouse or on Advance's trucks." Each of these findings suggests that Eisenberg was an Advance employee.
 
 
 31
 As to the sixth factor, the District Court found that Eisenberg "was not hired for a specific move or project." Instead, the District Court found that Eisenberg was assigned to "numerous moves or projects," and was required "to perform work onAdvance's trucks and in its warehouse, on whatever moves or projects Advance undertook while she was there." This finding bolsters the conclusion that Eisenberg was an employee. See id. at 863 ("[I]ndependent contractors are typically hired only for particular projects ....").
 
 
 32
 As to the eighth factor, the District Court found that Eisenberg was paid on an hourly basis. Compensation primarily or exclusively on the basis of time worked (rather than on the basis of projects completed) suggests that a worker is an employee. See id. As to the ninth and tenth factors, the District Court found that Advance is "in the business of moving and storage" so that Eisenberg's work was "in the regular business of Advance," and that, "[o]bviously, Advance is a business." Each of these findings favors characterizing Eisenberg as an employee. See id.
 
 
 33
 The weighing of these factors, which is a question of law reviewed de novo, see id. at 860-61, demonstrates that the scale tips decisively toward the conclusion that Eisenberg was an employee. Eisenberg was an unskilled laborer paid on an hourly basis whose job required her to perform the very tasks-moving and storage-that were at the heart of Advance's business. She did not use her own truck or tools, and she was not hired for any particular project. Most importantly, Advance exerted close, pervasive control over Eisenberg-she does not appear to have had any substantial discretion over how to complete her assigned tasks. Indeed, the only evidence that suggests that Eisenberg was an independent contractor was Advance's tax treatment of her services and its decision not to provide her with certain benefits. These facts, which have little to do with the day-to-day reality of Eisenberg's relationship to Advance, cannot counter-balance, much less outweigh, the combined weight of the remainder of the evidence. Therefore, we conclude that Eisenberg was an "employee" within the meaning of Title VII and the NYHRL.
 
 III.
 
 34
 For the reasons stated above, we hold that in determining whether a worker is a covered employee within the meaning of Title VII and the NYHRL, special weight should ordinarily be placed on the extent to which the hiring party controls the "manner and means" by which the worker completes her assigned tasks, rather than on how she is treated for tax purposes or whether she receives benefits. Accordingly, we REVERSE the judgment of the District Court, and REMAND the cause to the District Court for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 The Honorable Miriam Goldman Cedarbaum, of the United States District Court for the Southern District of New York, sitting by designation.
 
 
 [1]
 Other relevant factors may also be considered, see, e.g., Frankel v. Bally, Inc., 987 F.2d 86, 90 (2d Cir. 1993) (describing Reid's "agency test" as "offer[ing] a non-exhaustive list of factors to be considered"), so long as they are drawn from the common law of agency that Reid seeks to synthesize.
 See generally Restatement (Second) of Agency § 220 cmt. h (1958) (describing factors, some of which are not enumerated in Reid).
 
 
 [2]
 Although Frankel was an Americans with Disabilities Act ("ADA") case, we have observed that "the definition of `employee' under the ADA parallels that under Title VII and was intended to be given the same meaning." Castellano v. City of New York, 142 F.3d 58, 69 (2d Cir. 1998) (internal quotation marks omitted).
 
 
 [3]
 In such cases, an individual creates a copyrightable work for a firm, and no contract allocates the respective intellectual property rights of the creator and the firm. When one party claims the copyright in the work, the court must determine with reference to the common law of agency whether the creator was a firm employee (in which case the copyright usually belongs to the firm) or whether the creator was an independent contractor (in which case the copyright usually belongs to the individual creator). See generally 17 U.S.C. § 201(b); Aymes, 980 F.2d at 860.
 
 
 [4]
 It bears repeating that the parties do not dispute the District Court's factual findings-only the conclusions that the District Court drew from them and its balancing of the Reid factors. See ante at [8:6-9].
 
 
 [5]
 Of course, some moving jobs may well require specialized skills. See, e.g., Lanigan Storage & Van Co. v. United States, 389 F.2d 337, 341 (6th Cir. 1968). Our point here is only that the particular moving work that Eisenberg performed did not require such skills.