**METROPOLITAN PILOTS ASSOCIATION, L.L.C.,**
Plaintiff,

v.

**Rodin SCHLOSBERG, Defendant.**

**Rodin Schlosberg, Third–Party Plaintiff,**

v.

**Moran Towing & Transportation Company, Inc., Third–Party Defendant.**

No. 99–5804 (MLC).

United States District Court, D. New Jersey.

July 6, 2001.

Kenneth H. Mack, Thomas Hower, Fox, Rothschild, O'Brien & Frankel, LLP, Princeton Pike Corporate Center, Lawrenceville, NJ, for Plaintiff.

Ira A. Ginsburg, Morris Plains, NJ, Robert M. Rosen, argued, Rosen, Leff, Hempstead, NY, for Defendant/Third–Party Plaintiff.

Francis X. Dee, argued, Michael D. Thompson, Carpenter, Bennett & Morrissey, Newark, NJ, for Third–Party Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on the motion of third-party defendant Moran Towing & Transportation Company, Inc. ("Moran") for summary judgment against third-party plaintiff Rodin Schlosberg ("Schlosberg") pursuant to Federal Rule of Civil Procedure 56, and on Moran's appeal of the magistrate judge's March 23, 2001

Order to the extent it found that counsel for Moran violated 46 U.S.C. § 6308 and the magistrate judge's January 5, 2001 Order by providing the Court with a copy of a Coast Guard report as part of the reply papers filed in connection with Moran's motion for summary judgment. Schlosberg's third-party complaint alleges that as an employee of Moran he was terminated in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 (the "ADEA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 (the "ADA"), and the New York Human Rights Law, N.Y. Exec Laws § 296 (the "NYHRL"). In addition, Schlosberg's third-party complaint alleges that Moran breached a contract between Schlosberg and Moran by failing to provide adequate notice before termination. The motion for summary judgment will be granted as to the discrimination claims because we find as a matter of law that Schlosberg was not an employee of Moran when he was terminated but rather, as a member of the Metropolitan Pilots Association (the "MPA"), he was acting as an independent contractor. The motion for summary judgment will also be granted on the contract claims because we find as a matter of law that the contract sued upon had been superseded by a subsequent contract between the MPA and Moran, and had been abandoned by Schlosberg and Moran. In addition, Moran's appeal from the March 23, 2001 Order will be denied as moot based on our granting of summary judgment in favor of Moran as to all claims contained within the third-party complaint.

## JURISDICTION

The Court has jurisdiction over this controversy based on 28 U.S.C. § 1332(a), in that there is complete diversity between the parties. In addition, the Court has jurisdiction over the third-party action based on 28 U.S.C. § 1331 because adjudication of the third-party action involves questions of federal law.

## BACKGROUND

Schlosberg worked in conjunction with Moran as a tugboat captain and a docking pilot from 1974 until 1989. (Aff. of Captain Rodin Schlosberg ("Schlosberg Aff.") ¶ 4.) Moran contracts with companies to provide docking services to vessels entering and leaving New York harbor. (Aff. of Francis Dee ("Dee Aff.") Ex. D: Dep. of Mark Vanty ("Vanty Dep.") at 1082.) From 1974 until 1988, Schlosberg's duties were interchangeable and included piloting the tug vessels owned by Moran and boarding and piloting the ships entering and leaving the harbor. (Dee Aff. Ex. A: Dep. of Rodin Schlosberg ("Schlosberg Dep.") at 165.) For these services, Schlosberg received income as a W–2 employee as well as medical benefits directly from Moran.[1] (Schlosberg Aff. ¶¶ 4, 15.)

On February 14, 1989, following a union strike, Schlosberg and five other docking pilots formed the MPA. (*Id.* ¶¶ 5, 13.) Each individual member of the MPA then individually contracted with Moran in 1989 and subsequently again in 1992 to provide exclusive piloting services to ships using Moran's tugs to dock or leave port.[2] (*See,*

---

1. In 1981, Schlosberg created Rodin Schlosberg Inc. of which he was the sole employee and owner. (Schlosberg Dep. at 146.) When Schlosberg's corporation was created, Schlosberg continued to receive income from Moran as a W 2 employee until 1989, when he began receiving income as a 1099 independent contractor. (*Id.* at 172.)

2. The 1989 agreement, referring to Schlosberg as an independent contractor, stated that he would not provide pilotage service to any vessel that did not use Moran tugs to assist the vessel to or from port. (Dee Aff. Ex. H: Agreement Between Moran Towing & Transportation Co., Inc. and Rodin Schlosberg dated 2–14–89 ("1989 Agreement").)

*e.g.*, Dee Aff. Ex. H: Agreement Between Moran Towing & Transportation Co., Inc. and Rodin Schlosberg dated 2–14–89 ("1989 Agreement"); Schlosberg Dep. Ex. Schlosberg 1: Agreement Between Moran Towing & Transportation Co., Inc. and Rodin Schlosberg dated 5–1–92 ("1992 Agreement").) While Moran was paid for its tugboat service, Schlosberg and the other members of the MPA were being paid by the shipowners, through the MPA, for their piloting services. (*See* Schlosberg Dep. at 177.) The contract also stated Schlosberg would receive income as a 1099 independent contractor from Moran for any non-piloting services provided to Moran during the term of the contract. (1989 Agreement ¶ 7; 1992 Agreement ¶ 7.) Although medical coverage was not available to Schlosberg through Moran's employee health care plan, Moran allowed Schlosberg and the other pilots associated with the MPA to participate in Moran's health care plan if the MPA reimbursed Moran for all the expenses and premiums of the plan. (Aff. of William Muller ("Muller Aff.") ¶ 7.) Moran also provided the MPA pilots with a space on Moran's property to park a trailer. (Dee Aff. Ex. E: Dep. of Douglas Brown ("Brown Dep.") at 445.) This trailer provided sleeping quarters for the MPA pilots during their work shifts and allowed easier communication between the dispatcher and the pilots. (*Id.*)

In 1996, Moran formed an agreement (the "1996 Agreement") directly with the MPA.[3] (Dee Aff. Ex. O: Agreement Between Moran Towing & Transportation Co., Inc. and Metropolitan Pilots Association, L.L.C. dated 4–8–96 ("1996 Agreement").) As a result, the shipowners paid, and were billed by, the MPA for piloting services and the MPA, in turn, paid the pilots.[4] (Schlosberg Dep. at 177–79.) Moran paid one fee to the MPA for the non-piloting services of the pilots and the MPA divided the money between its members. (*Id.*) Moran continued to offer health care coverage to the MPA pilots under its own company plan but the MPA reimbursed Moran for these costs. (Muller Aff. ¶ 8.) MPA employees were not entitled to benefits of a Moran employee such as annual leave, pension, or profit sharing. (*Id.* at 10, 11.)

When an order came into Moran for tugboat assistance, Moran suggested that the shipowners employ the services of the MPA. (Dee Aff. Ex. C: Dep. of William Muller ("Muller Dep.") at 681.) If the shipowner agreed, Moran would radio the MPA pilot on duty and inform him of the location of the ship. (Vanty Dep. at 1094.) Moran would contact a pilot from a work rotation list given to Moran by the MPA. (Schlosberg Dep. at 252.) If the vessel was leaving, the pilot would board the ship and through help from the tugboats, guide the ship away from the harbor. (Vanty Dep. at 1090.) If the vessel was docking, the pilot would board a Moran tugboat, travel to where the vessel was located,

---

**3.** If Moran is the owner of a ship that needs piloting services, Moran pays the MPA for such services at "rates to be negotiated to the satisfaction of both parties." (Dee Aff. Ex. O: Agreement Between Moran Towing & Transportation Co., Inc. and Metropolitan Pilots Association, L.L.C. dated 4–8–96.)

**4.** According to the 1989 Agreement, Moran provided Schlosberg with billing services to the shipowners at no cost to Schlosberg but did not assist in collections or take responsibility for past due payments. (1989 Agreement ¶ 9.) Once the MPA was technically able to perform accounts receivable, Rodin Schlosberg Inc. no longer used the billing services offered by Moran; instead, Schlosberg, through Rodin Schlosberg Inc., collected money from the MPA who received money directly from the shipowners. (Schlosberg Dep. at 177.)

board the vessel, and dock the vessel into the harbor.[5] (*Id.*) The Moran tugboats and the MPA docking pilots must work in collaboration to ensure the safe voyage of the vessel. (*Id.* at 1082.) The shipowner then pays Moran for its tugboat service and the MPA separately for its piloting services. (Muller Aff. ¶ 3.)

In 1994, the Internal Revenue Service ("IRS") audited Moran and questioned why Moran was not paying employment taxes on the MPA pilots. (*Id.* ¶ 14.) After Moran submitted a position paper explaining that the MPA pilots provide the bulk of their services to the shipowners, are paid the majority of their income by the shipowners, pay for their own benefits, are not covered under Moran's profit sharing or pension plan and are not instructed or supervised by Moran employees, the IRS concluded that the MPA pilots were not employees of Moran for tax purposes. (*Id.* ¶¶ 15–16.)

Starting in May 1998, Schlosberg was involved in three accidents over a period of seven months involving the ships he was piloting.[6] (Schlosberg Dep. at 292, 318, 333.) On December 18, 1998, the same day as Schlosberg's third accident, Schlosberg had a heart attack that required hospitalization.[7] (Schlosberg Aff. ¶ 40.) After Schlosberg's third accident, Moran informed the MPA by telephone that it did not want Schlosberg's name on the rotation of docking pilots and the MPA complied by informing Schlosberg in writing that he was no longer a member of the MPA[8] (Vanty Dep. at 1187; Muller Aff. ¶ 17; Naughton Dep. Ex. M: Letter from Naughton to Schlosberg dated 4/14/99.)

Schlosberg subsequently filed a charge with the Equal Employment Opportunity Commission (the "EEOC") alleging that Moran discriminated against him under the ADEA and the ADA. (Dee Aff. Ex. F: Notice of Charge of Discrimination dated 1/12/00.) The EEOC closed its file on the charge finding no employee/employer relationship. (Dee Aff. Ex. G: Dismissal and Notice of Rights dated 3/23/00.)

On October 8, 1999, the MPA filed this action in the Superior Court of New Jersey against Schlosberg seeking a declaratory judgment to expel Schlosberg from the organization. Schlosberg removed the case to this Court based upon the diversity of the parties. Schlosberg filed a counterclaim against the MPA on December 14, 1999, seeking damages for his improper expulsion from the MPA.[9] Schlosberg filed a third party complaint against Moran on December 30, 1999. Schlosberg filed an amended third-party complaint on June 23,

---

5. Pursuant to the 1996 agreement, before the MPA pilot can begin assisting the vessel, the captain of the ship must sign a "pilotage slip" acknowledging that the pilot is the "borrowed servant of the vessel" and "Moran does not furnish pilots." (*Id.* at 185.)

6. In 1996, Schlosberg was piloting the Nedlloyd Dejima when it ran aground. (Dee Aff. Ex. A at 302.) In 1998, Schlosberg was piloting the Texas when it struck a caisson leaving a 12 inch round hole in the bow. (*Id.* at 318.) Schlosberg was involved in a third accident when, in 1998, he was piloting the vessel Sudi Abha and it ran aground. (*Id.* at 345.)

7. Schlosberg had a past history of heart and lung problems. (Schlosberg Aff. ¶ 41.) After

each time Schlosberg was out of work for an illness, he had to obtain a "Fit for Duty Certificate" before he could return. (*Id.*)

8. Based on Schlosberg's three incidents, Moran allegedly decided it did not want to be associated with Schlosberg because of his safety record and instructed the MPA to rectify the situation in accordance with the 1996 Agreement. (Dee Aff. Ex. D at 1137.)

9. In deciding this motion, the Court will not specifically address any of the claims raised in the MPA's complaint or Schlosberg's counterclaim.

2000 stating claims under the ADEA, the ADA, the NYHRL, and state contract law alleging he was terminated from the MPA because of discrimination and breach of his 1992 contract with Moran. Moran has moved for summary judgment claiming that (1) Schlosberg was not an employee of Moran and thus not subject to regulation under the ADEA, the ADA or the NYHRL and (2) the 1996 contract with the MPA superseded the 1992 contract with Schlosberg, therefore the clause in the latter contract entitling Schlosberg to ten days written notice before termination is void and does not constitute a breach of contract. (Third Party Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 1.)

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the non-moving party must present evidence that establishes that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548; *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). A non-moving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. 2505. Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 106 S.Ct. 2505 (citation omitted).

## I. *Disability Claims*

Schlosberg alleges that Moran is liable for violations under the ADA, the ADEA, and the NYHRL. (Third–Party Pl.'s Br. in Opp'n to Mot. for Summ. J. at 10, 30.) Moran argues that its relationship with Schlosberg is not governed by these statutes because Schlosberg is an independent contractor and not an employee of Moran. (*Id.*)

In the absence of a disputed issue of material fact, the question of whether or not an individual is an employee is a question of law to be determined

by the court. *Cox v. Master Lock Co.*, 815 F.Supp. 844, 845 (E.D.Pa.1993), *aff'd*, 14 F.3d 46 (3rd Cir.1993). The relevant statutes cited by Schlosberg do not give a clear definition of what constitutes an employee. Cases interpreting the ADA, the ADEA, and the NYHRL have held that only employees and not independent contractors are protected under these anti-discrimination statutes. *See E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32, 37 (3d Cir. 1983) (holding that the ADEA does not protect independent contractors); *Carney v. Dexter Shoe Co.*, 701 F.Supp. 1093, 1100–03 (D.N.J.1988) (holding that the ADEA does not protect independent contractors); *Birchem v. Knights of Columbus*, 116 F.3d 310, 312 (8th Cir.1997) (holding that the ADA does not protect independent contractors); *Scott v. Mass. Mut. Life Ins. Co.*, 86 N.Y.2d 429, 633 N.Y.S.2d 754, 756, 657 N.E.2d 769 (1995) (holding that the NYHRL does not protect independent contractors).

 To determine whether an individual is an employee or an independent contractor, the Third Circuit had previously adopted the "hybrid test," combining the traditional common law "right to control" test with an "economic realities" test.[10] *Zippo*, 713 F.2d at 38. However, in 1992, the United States Supreme Court held that when interpreting statutes in which Congress has not helpfully defined the term "employee" the courts should use the common law agency test identified in *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), to determine whether a person is an employee. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323, 112 S.Ct.

1344, 117 L.Ed.2d 581 (1992). In *Reid*, the court applied thirteen factors in its common law agency test to determine whether the plaintiff was an employee of the defendant. 490 U.S. at 751, 109 S.Ct. 2166. Each factor "must be assessed and weighed with no one factor being decisive." *Darden*, 112 S.Ct. at 1349. The test, however, does place greater emphasis on the first factor; the hiring party's right to control the manner and means by which the work is accomplished. *See Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir.1993). We will examine each factor as it applies in the present case.

### 1. The hiring party's right to control the manner and means by which the product is accomplished

 All other factors being equal, the right to control an individual's physical conduct may be determinative of whether the person is an employee or an independent contractor. *Eisenberg v. Advance Relocation & Storage*, 237 F.3d 111, 115 (2nd Cir.2000). Moran exercised virtually no control over the manner and means of Schlosberg's piloting activities. It is a well-established rule that when a docking pilot is on board a vessel and is placed in charge of that vessel, he is an employee of the shipowner. *Sun Oil v. Dalzell Towing Co., Inc.*, 287 U.S. 291, 295, 53 S.Ct. 135, 77 L.Ed. 311 (1932). In *Sun Oil*, the court found that a tugboat captain became an employee of the shipowner when he boarded the vessel to perform pilotage services. (*Id.*) In the present case, Schlosberg, in the performance of his daily activities as a docking pilot, acted as an employee of the shipowner. (Schlosberg Dep. at 180.) However, unlike the respondent in *Sun*

---

**10.** The "economic realities test" is commonly found in cases involving the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir.1981). The test examines the economic dependence between the individual and the employer to determine their employment status. *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir.1976).

*Oil,* Schlosberg's only occupation was docking vessels. (*Id.*) Thereby, Moran could not control the means or manner to which Schlosberg could perform his occupation. Schlosberg independently determined how to pilot each ship while Moran's tugboats accompanied the docking process. (Schlosberg Dep. at 218.) The tugboat operators were directed by Schlosberg as he saw fit to ensure each successful docking operation. (*Id.*) In addition, Schlosberg and all the MPA pilots could refuse to perform a docking job and Moran could not make the MPA pilots dock Moran ships without paying the MPA an agreed upon fee. (Brown Dep. at 538; 1996 Agreement ¶ 6(c).)

In *Cox,* the court found no employer control over an independent contractor who had incorporated himself, set his own hours and vacation time, provided his own insurance, paid his own income and social security taxes and received no annual leave or retirement benefits. 815 F.Supp. at 847. In this case, the MPA controlled the work schedule of the pilots and published the fees charged for piloting. (Schlosberg Dep. at 252; 1996 Agreement ¶ 6(a).) The MPA and its members controlled its own promotions, vacation time, sick pay, severance pay, licensing, training and disbursement of funds to its members. (Dee Aff. Ex. B: Dep. of James Naughton ("Naughton Dep.") Ex. E: MPA Rules dated 11–7–89.) Viewing the evidence in the light most favorable to Schlosberg, we find that Moran did not have the right to control the manner and means by which Schlosberg performed his job. Accordingly, this most important factor supports Moran's contention that Schlosberg was an independent contractor.

### 2. *The skill required*

■ Individuals who are unskilled labor are usually regarded as employees rather than independent contractors. Restatement (Second) of Agency § 220(2)(d) (1957). Schlosberg's piloting abilities as well as his capability to train Moran's tugboat operators per the MPA's 1996 contractual agreement with Moran is representative of the high level of skill that is required to be a docking pilot. (Schlosberg Dep. at 245.) The Supreme Court has recognized a distinction between tugboat captains and docking pilots. *See Sun Oil,* 287 U.S. at 294, 53 S.Ct. 135. In *Sun Oil,* the court ruled that once a pilot boards and takes control of a vessel, he becomes independent of his employer for liability purposes. *Id.* This level of skill and independence from liability is analogous to the type of skill and independence required by a doctor.[11] *See Alexander v. Rush N. Shore Med. Ctr.,* 101 F.3d 487, 492 (1996) (dismissing discrimination claim because doctor was found to be independent contractor and not employee of hospital). However, when a doctor is paid directly by his patients and he pays his own licensing fees, professional fees, retirement benefits, health and life insurance, and malpractice insurance, he is considered an independent contractor. *See Beverley v. Douglas,* 591 F.Supp. 1321, 1327 (S.D.N.Y. 1984). Viewing the evidence in the light most favorable to Schlosberg, we find that the skill required to perform Schlosberg's duties was very high. Thus, our analysis of this factor supports the conclusion that Schlosberg was an independent contractor.

### 3. *The source of the instrumentalities and tools*

■ An individual who provides their own necessary instrumentalities and tools

---

**11.** Schlosberg compares the discretion that a surgeon has in a hospital to the discretion of a docking pilot during the docking of a vessel. (Pl's Br. at 15.)

for their profession is usually considered an independent contractor. Restatement (Second) of Agency § 220(2)(e) (1957). Originally, Moran had provided funds for two-way radios to the pilots in order to communicate with Moran's dispatcher and the tugboat captains during docking procedures. (Brown Dep. at 444.) However, after this initial disbursement of radios in 1992, Moran informed the individual pilots that replacement of the radios would be their responsibility and that any new pilots entering the MPA after the initial disbursement were responsible for purchasing their own radios. *Id.* A trailer that was purchased by the MPA, not Moran, is located on Moran's property. (Naughton Dep. at 74.) This trailer provides the pilots with sleeping quarters during their 12 to 24 hour shifts. (Brown Dep. at 445.) The purpose of both the radios and the provision of the parcel of land for which the MPA was permitted to place its trailer is to provide Moran dispatchers easy communication with the pilots of the MPA. (Schlosberg Dep. at 218.)

The tugboats that Moran uses during docking procedures may be considered an instrumentality of Schlosberg's work. (Vanty Dep. at 1082.) However, the relationship between Moran tugboats and the docking pilots appears to be a symbiotic one made by contractual agreement between the MPA and Moran. Moran needs to contract with either the MPA or another docking pilot to accomplish the task of docking a ship. (Brown Dep. at 544.) At the same time, the MPA benefits by contracting with Moran, a tugboat company, to accomplish its task of piloting a vessel in or out of port. Finally, the most important instrumentality used by Schlosberg and the other docking pilots is the ship they were asked to pilot. This instrumentality is provided by the client of Moran and the MPA. Viewing the evidence in the light most favorable to Schlosberg, al-

though Moran provided some instrumentalities and tools to Schlosberg to allow him to do his job, most of the instrumentalities and tools were provided by the MPA and the clients of the MPA and Moran. Accordingly, our analysis of this factor supports the conclusion that Schlosberg was an independent contractor.

#### 4. The location of the work

■ There is a strong indication of an employee—employer relationship if the work is performed on the premises of the employer. Restatement (Second) of Agency § 220(2)(e) (1957). Approximately ninety-five percent of the time Schlosberg spent performing his job as a docking pilot was on board a vessel owned by customers of the MPA who paid the MPA a fee for piloting their ships. (Schlosberg Dep. at 249.) Although Schlosberg spent some of his time on board Moran's tugboats to get to the clients' ships or waiting in the MPA's trailer on Moran's property, the most significant time, the time for which he was paid, was spent on board the clients' ships. Viewing the evidence in the light most favorable to Schlosberg, although Schlosberg spent some time on Moran's land and tug boats, our analysis of this factor supports the conclusion that Schlosberg was an independent contractor.

#### 5. The duration of the relationship between the parties

■ Employment over a considerable period of time indicates that an individual is an employee rather than an independent contractor. Restatement (Second) of Agency § 220(2)(f) (1957). Schlosberg has been associating with Moran since 1967. (Schlosberg Aff. ¶¶ 3, 4.) Schlosberg began working for Moran as a deckhand. (Id. ¶ 3.) From 1974 to 1988 Schlosberg performed services as a tugboat captain, a docking pilot, and other tasks periodically

assigned. (Id. ¶ 4; Schlosberg Dep. at 165.) In 1989, Schlosberg began contracting with Moran to provide piloting services as well as training and promotional services. (1989 Agreement ¶¶ 4, 7.) From 1996 until the time he was terminated, Schlosberg was a part of the MPA which contracted with Moran on behalf of all the docking pilots. (Muller Dep. at 689.) Although the duration of Schlosberg's relationship with Moran and his employment status between 1967 and 1988 support a finding that Schlosberg was an employee of Moran until 1988, the relationship between the parties appears to have changed in 1989. Since 1989, Schlosberg no longer acted as a tugboat captain for Moran. (Schlosberg Aff. ¶ 7.) In addition, since that time, Schlosberg's interactions with Moran were fundamentally different than prior to 1989. Thus, although the duration of the relationship between the parties supports the conclusion that Schlosberg was an employee rather than an independent contractor, we do not believe this factor should be given very much weight.

### 6. Whether the hiring party has the right to assign additional projects to the hired party

■ An employer—employee relationship is more likely to exist if the hiring party has the right to assign additional projects to the hired party. Paragraph seven of the 1996 Agreement reads,

> Members of the Association shall, when requested by Moran, represent Moran at industry or trade meetings, advise with respect to proper towing procedures, instruct employees of Moran with respect to towing and docking procedures and related matters pertaining to tugboat operations and, in general, render such assistance to Moran as the company may reasonably request. For such non-pilotage services, Moran shall pay the Association an annual fee of

> $270,000.00, payable in equal monthly installments.

(1996 Agreement ¶ 7.)

The type of work outlined in the relevant paragraph is reflective of the high level of skill required to be a docking pilot. (Id.) MPA pilots represent Moran at trade shows and train Moran tugboat captains on the procedures of docking in order to promote the businesses of the MPA and Moran and to ensure the synchronicity between the pilots and the tugboats for better productivity. (See Schlosberg Dep. at 172.) In addition, Moran could not assign the MPA pilots to pilot Moran's own ships without agreeing to a fee and compensating the MPA like a typical shipowner. (1996 Agreement ¶ 6(c).) Viewing the evidence in the light most favorable to Schlosberg, we conclude that this factor supports Moran's contention that Schlosberg was an independent contractor because Moran could not assign additional duties to Schlosberg that were not agreed upon in the 1992 and 1996 agreements

### 7. The extent of the hired party's discretion over when and how long to work

An employer—employee relationship is more likely to exist when the hired party exerts a greater discretion over when and how long to work. Under the 1996 Agreement, the MPA determines the work rotation for its pilots, makes a list of its pilots and gives the list to Moran. (Schlosberg Dep. at 252.) When a shipowner contacted Moran with a docking job, Moran, in turn, utilized the list of pilots and contacted the next pilot on the list to perform the docking procedure. (Id. at 254.) Viewing the evidence in the light most favorable to Schlosberg, we conclude that Moran has little control over the time and manner for which the individual pilots of the MPA

were to work. Accordingly, our analysis of this factor supports the conclusion that Schlosberg is an independent contractor.

### 8. The method of payment

**[12]** To determine whether an individual is an independent contractor or an employee, the court may look at whether the worker is paid hourly or by salary. Restatement (Second) of Agency § 220(2)(g) (1957). Another factor to consider is who provided the worker with payment for services. In this case, the MPA is paid for its piloting services not from Moran but directly from the individual shipowners who employ their services. (Schlosberg Dep. at 188–189.) Thereafter, each individual member of the MPA, including Schlosberg, was paid by the MPA. (*Id.*) Although payment for non-piloting services comes from Moran, this payment made up only fifteen percent of the MPA's yearly income and was paid on an annual basis. (Naughton Dep. at 1048.) The majority of the income of MPA members fell within the scope of their regular employment, that is, docking vessels, and the income they received was paid directly from the shipowners. (Schlosberg Dep. at 188–189.)

Schlosberg contends that because the shipowners first contact Moran with the request for docking and then Moran contacts the pilots with the information, the MPA pilots would not be paid if Moran were not the initial contact; therefore, Moran is the source of income and provider of payment for the MPA pilots. (Third Party Pl.'s Resp. to Moran's Statement of Material Facts to which No Genuine Issue of Fact Exists ("Pl.'s Resp.") ¶ 73.) This argument fails because the purpose of the 1996 Agreement was to maintain an exclusive, symbiotic relationship between Moran and the MPA in order to maintain consistent, reliable service to the shipowners

through the direct communication between Moran's dispatcher and the pilots on duty. (1996 Agreement at 1, ¶¶ 2, 8(a).) While docking ships, the MPA pilots worked for and were paid by the individual shipowners. (Schlosberg Dep. at 188–189.) Viewing all the evidence concerning this factor in the light most favorable to Schlosberg, our analysis supports the conclusion that Schlosberg was not an employee of Moran.

### 9. The hired party's role in hiring and paying assistants

An individual who can hire his own assistants may be considered an independent contractor. *Reid,* 490 U.S. at 753, 109 S.Ct. 2166. The MPA hires its own accountants, lawyers, and other assistants without any input from Moran. (Muller Aff. ¶ 11.) Moran does, however, maintain veto power over any pilot who wishes to become a member of the MPA. (1996 Agreement ¶ 8(a).) The purpose of this stipulation, according to the 1996 Agreement, was to maintain the quality of Moran's service through the character, knowledge and skill of the MPA's members. (*Id.*) Viewing these facts in the light most favorable to Schlosberg, our analysis of this factor supports the conclusion that Schlosberg was an independent contractor.

### 10. Whether the work is part of the regular business of the hiring party

Third-party defendant Moran is in the docking business. However, Moran does not provide pilotage services to shipowners. (Muller Dep. at 676.) Moran only supplies the tugboats and the tugboat captains necessary to guide vessels to and from port. (Muller Aff. ¶ 2.) Although our analysis of the evidence reveals a close relationship between the two parties, it appears that Moran has separated itself from the business of employing docking

pilots. Therefore, viewing the evidence in the light most favorable to Schlosberg, we find that the occupation of piloting a ship into dock is not a part of Moran's business and our analysis of this factor supports the conclusion that Schlosberg was an independent contractor.

### 11. Whether the hiring party is in business

Moran is in business. Although this factor supports Schlosberg's contention that he was an employee of Moran, the fact that Schlosberg's dealings with Moran since 1989 were through his own business, Rodin Schlosberg, Inc., or through the MPA, LLC, mitigates against giving much weight to this factor.

### 12. The provision of employee benefits

■ Independent contractors generally do not receive employee benefits. *Reid,* 490 U.S. at 753, 109 S.Ct. 2166. Moran employees are entitled to health, life and disability coverage as well as pension and profit sharing plans. (*Id.* ¶¶ 8, 10.) Moran did not provide any of these employee benefits to Schlosberg or the other pilots of the MPA. (*Id.*) Moran did arrange for its healthcare insurer to provide coverage for "pilots who were not employees of Moran ... but with whom Moran ... maintained an independent contractor relationship." (*Id.* Ex A: Letter from Cigna Healthcare to Moran dated 9/20/95.) The insurance premiums for these policies were paid for by the individual pilots through the MPA. (Id. ¶ 8; Brown Dep. at 549.) Schlosberg argues that the fees paid by the pilots to Moran were an exchange of money from the fee paid to the MPA for additional services in the 1996 Agreement; and therefore, the insurance policy was a "scheme" to present the appearance of an independent contractor relationship. (Pl.'s Resp. ¶ 73.)

We find this argument unimpressive. The additional fees paid out to the MPA in accordance with the 1996 Agreement were for the training of Moran employees and the representation of Moran at trade meetings. (1996 Agreement ¶ 7.) There is no evidence that the MPA did not fulfill this contractual obligation. Instead, it appears that the issuing of an insurance policy and payment of premiums were separate and independent covenants under the 1996 Agreement and had no relation to the fees paid by Moran for additional service from the MPA. Furthermore, if an MPA pilot declined to be covered by the insurance policy, that pilot would retain the money that would have been paid in premiums to Moran. (Brown Dep. 549–50.) Thus, there is no factual support in the record for Schlosberg's argument that the $270,000 annual payment by Moran to the MPA was provided solely to cover the costs of health insurance. Viewing the evidence in the light most favorable to Schlosberg, we find that this factor supports the conclusion that Schlosberg was an independent contractor.

### 13. The tax treatment of the hired party

■ From 1989 to his termination from the MPA, Schlosberg maintained a 1099 income status with Moran. (Schlosberg Dep. at 172.) Schlosberg, through Rodin Schlosberg, Incorporated, paid his own unemployment insurance, his own FUTA and FICA tax and his own worker's compensation. (*Id.* at 259.) In 1995, the IRS investigated the relationship between Moran and the MPA pilots and concluded that Moran was not required to pay the pilots' employment taxes. (Muller Aff. ¶ 15.) Viewing the evidence in the light most favorable to Schlosberg, we find that Schlosberg was being treated as an independent contractor for tax purposes. Our

analysis of this factor supports the conclusion that Schlosberg was an independent contractor.

After viewing the evidence in the light most favorable to Schlosberg and balancing all the factors of the Reid test, we find as a matter of law that Schlosberg was an independent contractor and not an employee of Moran. Indeed, although the fact that Moran is in business, the long relationship of the parties, and Moran's control over the hiring of new pilots may support the inference that Schlosberg was Moran's employee, all other factors weighed in favor of a finding that Schlosberg was not Moran's employee. Based on our analysis of the relevant factors, we conclude as a matter of law that no rational fact finder could find Schlosberg to be Moran's employee. Accordingly, we will grant Moran's motion for summary judgment in connection with Schlosberg's claims based on the ADA, the ADEA, and the NYHRL.

## II. *Contract Claims*

■■■ Schlosberg alleges that Moran is liable for breach of his 1992 contract with Moran. (Def.'s Br. at 30.) Specifically, Schlosberg alleges that Moran breached the contract by refusing to allow him to return to work for the MPA because of his health problems. (Schlosberg Aff. ¶ 46.) Moran argues that Schlosberg's claim of a breach of the 1992 contract is without merit because (1) the contract was superseded by the 1996 Agreement, and (2) the contract was abandoned by Schlosberg when he began to perform in accordance with the 1996 Agreement. (Def.'s Br. at 27–28.) Because the parties are located in New York and the contract was negotiated and performed in New York, we will apply New York contract law. *See Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1192 (S.D.N.Y.1996) (holding that when both parties negotiated and entered into agreement in New York, and defendant's place of business was in New York, New York law controls); *Armotek Indus. v. Employers Ins. of Wausau*, 952 F.2d 756, 760 (3d Cir.1991) (using five factors to determine which state's law to apply to insurance contract).

■■■ Under New York law, a subsequent contract that deals with the same subject matter supersedes the former contract. *Indep. Energy Corp.*, 944 F.Supp. at 1195. In addition, when a contract has a merger clause, stating that the agreement between the parties is the final agreement, the prior contract is unenforceable. *Thayer v. Dial Indus. Sales*, 85 F.Supp.2d 263, 269 (S.D.N.Y.2000). Here, the 1996 Agreement deals with the same subject matter and is very similar to the 1992 contract. (*Compare* 1996 Agreement *with* 1992 Agreement.) In addition, the 1996 Agreement contained a clause stating that the parties agreed "that the aforementioned terms and conditions [were] the final expression of their agreement." (1996 Agreement ¶ 11.) This merger clause in the 1996 Agreement binds the members of the MPA and supersedes any prior agreements made between Schlosberg and Moran. Viewing the evidence in the light most favorable to Schlosberg, we find as a matter of law that the 1996 Agreement superceded the 1992 contract.

■■■ Moran also argues that even if the 1996 Agreement did not supercede the 1992 contract, the 1992 contract was abandoned by Schlosberg when he began to perform on the 1996 Agreement between Moran and the MPA. (Def.'s Br. at 28.) If two parties mutually agree to abandon a contract, the contract then becomes unenforceable and all obligations under the contract are discharged. *Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.*, 807 F.Supp. 1007, 1021 (S.D.N.Y.1992). Schlosberg contends that he never agreed

to abandon the 1992 agreement. (Schlosberg Dep. at 264.) However, abandonment may be inferred by the conduct of the parties and the attendant circumstances. *Cauff, Lippman & Co.*, 807 F.Supp. at 1021. The conduct must be "positive, unequivocal and inconsistent with an intent to be further bound by the contract." *Id.* The 1992 agreement and the 1996 Agreement have many similar provisions concerning the performance of duties of the pilots. (*Compare* 1996 Agreement *with* 1992 Agreement.) In viewing the conduct of Schlosberg to determine whether he abandoned the 1992 agreement, we must compare the differences between both of the agreements and determine whether compliance with one contract is mutually exclusive with compliance with the other. The most relevant difference between the agreements is the payment provisions. Pursuant to the 1992 contract, Moran agreed to pay Schlosberg an annual fee for his non-piloting services. (1992 Agreement ¶ 7.) This payment stopped after the 1996 Agreement was enacted; instead, Moran began to distribute non-piloting fees to the MPA who, in turn, distributed them to the individual pilots. (Schlosberg Dep. at 190.) Schlosberg was aware of the change in payment and by conforming to the updated provisions in the 1996 Agreement, his conduct reflects a clear intent to abandon his former agreement with Moran. Viewing the evidence in the light most favorable to Schlosberg, we conclude as a matter of law that Schlosberg abandoned the 1992 contract. Therefore, even if the 1996 Agreement did not supercede the 1992 contract, the parties clearly abandoned the 1992 contract. Accordingly, we will grant summary judgment to Moran in connection with Schlosberg's claims based on the 1992 contract.

## CONCLUSION

For the foregoing reasons, we will grant Moran's motion for summary judgment

dismissing Schlosberg's claims for breach of contract and discrimination under the ADA, the ADEA, and the NYHRL. In addition, we will deny as moot Moran's appeal from the March 23, 2001 Order entered by the magistrate judge.