**Hailee DeSOUZA, Plaintiff,**

v.

**EGL EAGLE GLOBAL LOGISTICS LP and Richard Sweet, Defendants.**

**No. 3:06CV00050 (DJS).**

United States District Court, D. Connecticut.

Jan. 26, 2009.

Leon M. Rosenblatt, Lynn M. Mahoney, Law Offices of Leon M. Rosenblatt, West Hartford, CT, for Plaintiff.

C. Dean Herms, Jr., Allen Vahrenwald & Johnson LLC, Fort Collins, CO, Meghan D. Burns, Wiggin & Dana, New Haven, CT, Nancy L. Patterson, Baker & Hostetler, Houston, TX, Lawrence Peikes, Wiggin & Dana, Stamford, CT, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Hailee DeSouza ("the Plaintiff"), brings this action against the defendant, EGL Eagle Global Logistics LP ("the Defendant"),[1] alleging: (1) racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); (2) racial discrimination and retaliation in violation of the Connecticut Fair Employment Practices Act, Connecticut General Statutes §§ 46a–51 *et seq.* ("CFEPA"); and (3) violations of 42 U.S.C. § 1981. In addition, the Plaintiff brings claims alleging breach of contract and promissory estoppel. The Defendant filed a motion for summary judgment (dkt. # 58) pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). For the reasons that hereafter follow, the motion for summary judgment (dkt. # 58) is **GRANTED with respect to the Plaintiff's federal claims and CFEPA discrimination claim. Additionally, the Plaintiff's CFEPA retaliation, breach of contract, and promissory estoppel claims are DISMISSED without**

**prejudice to the Plaintiff bringing those claims in state court.**

## I. THE PLAINTIFF'S SUBMISSIONS

Before setting forth the background facts of this case, the Court must first address the Defendant's motion to strike (dkt. # 77), whereby it seeks to strike certain evidence supporting the Plaintiff's opposition memorandum. The Federal Rules of Civil Procedure do not, however, explicitly allow motions to strike for such a purpose. Rule 12(f) reads that, upon a motion or the court's own initiative, "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Affidavits and Local Rule 56(a) Statements are not "pleadings" under the Federal Rules. *See* Fed R. Civ. P. 7(a). Moreover, Rule 56, does not provide a "motion to strike" as a tool in the summary judgment process. *See* Fed R. Civ. P. 56.

There is no need to "strike" anything from the Plaintiff's opposition submissions. *See Martin v. Town of Westport*, 558 F.Supp.2d 228, 231 (D.Conn.2008). To begin with, most of the statements at issue involve the Plaintiff's assertions that the Defendant discriminated and retaliated against him. This is to be expected when a plaintiff brings a Title VII/CFEPA lawsuit. More importantly, however, is the fact the Court may consider only admissible evidence when ruling on summary judgment. Needless to say, the Court would not base a summary judgment deci-

---

1. In his complaint, the Plaintiff brought § 1981, breach of contract, and promissory estoppel claims against Sweet in his personal capacity. Thereafter, the Plaintiff moved to withdraw all claims against Sweet in his per-

sonal capacity (dkt. # 56), which the Court granted (dkt. # 57). This left EGL Eagle Global Logistics LP as the only remaining defendant.

sion simply upon the self-serving *ipse dixit* of a particular party. Thus, the Defendant's motion to strike (**dkt. # 77**) is **DENIED.**

## II. FACTS

The Plaintiff, an black man, owned and operated a thirty-three foot truck, which he has used in his business, Jeffmanns Express, LLC, to drive for a number of trucking companies in the past. On August 14, 2004, the Plaintiff applied to be a driver for the Defendant, a multinational freight transportation, logistics management, and information firm. Part of the application process required the Plaintiff to acknowledge and agree to obtaining a truck that was five years of age or newer and white in color.

The Plaintiff began driving for the Defendant on September 21, 2004. Although the Plaintiff did not have a compliant truck at the time, he was temporarily allowed to use his truck on the condition that he obtain a compliant model at a mutually agreed upon future date. It was the Defendant's custom to give extensions to a driver such as the Plaintiff, who might need additional time to update his vehicle.

Drivers for the Defendant's Hartford station come in on a daily basis and are given assignments to pick up and drop off freight loads at different points within the northeastern United States. Drivers typically come in the morning, drive during the day, and are required to return after their assignment to submit daily paperwork.

The Plaintiff maintains that, shortly after commencing driving for the Defendant, he, along with other black drivers, was being assigned longer and lower paying delivery routes in comparison to Caucasian drivers who drove similar trucks.[2] The Plaintiff also claims he had to sit in the dispatch area of the Defendant's Hartford station to wait for assignments, while Caucasian drivers would come back from deliveries and be given additional assignments right away.

On October 29, 2004, after being assigned, but declining, a "New York route," the Plaintiff questioned Richard Sweet ("Sweet"), the manager of the Hartford station, as to why certain drivers did not have to drive this kind of lower paying route. The Plaintiff claims Sweet responded by asking the Plaintiff if he was "playing the race card." The Plaintiff explicitly replied that he had not referred to race.

In late November 2004, the Plaintiff claims a driver, originally from Ghana, spoke up during a driver meeting and asked Sweet about preferential route assignments given to white drivers. The Plaintiff then claims that he spoke up with other black drivers in collective support of the driver. The Defendant, for its part, does not acknowledge that this meeting took place, nor does the Plaintiff provide any evidence as to how Sweet responded to the purported comments. The Plaintiff claims that, after the meeting, he received even less preferable routes.

After being given two written extensions to obtain a truck compliant with the Defendant's standards, the Defendant deactivated the Plaintiff's driving contract on March 21, 2005. At this time the Plaintiff told Sweet that he was in the market for a new truck and planned to purchase one soon. The Plaintiff claims that Sweet told him he would be able to continue driving for the Defendant once he obtained a new truck. In reliance, the Plaintiff put down

---

**2.** The Defendant's Hartford station contracts with many drivers who drive different types of vehicles, including, but not limited to, vans, straight trucks, and box trucks.

a deposit of more than $28,000 for a new truck with intention of being reactivated to drive for the Defendant. The Plaintiff alleges, however, that did not go through with the purchase because the Defendant refused to reactivate the contract, which the Plaintiff needed to have the insurance on the new truck take effect.[3] The Plaintiff then reneged on his contract with the truck dealer, forfeiting $5,000. As of June 2007, the Defendant stated that the Plaintiff was eligible to be reactivated to drive for the Defendant if he obtained a compliant truck.

On July 21, 2005 the Plaintiff filed a discrimination claim with the Connecticut Commission on Human Rights and Obligations ("CHRO")[4]. On November 15, 2005 the CHRO dismissed the complaint for lack of jurisdiction due to the Plaintiff not being an employee of the Defendant. On January 12, 2006 the Plaintiff filed a complaint with this Court and on February 26, 2007, he filed an amended complaint.

## III. DISCUSSION

The Plaintiff alleges that the Defendant's conduct constituted discrimination and retaliation in violation of Title VII and CFEPA, and denied him the same rights to make and enforce contracts and equal benefits of the laws in violation of § 1981. In addition, he alleges that the Defendant is liable under the theories of breach of contract and promissory estoppel. The Defendant denies most of the allegations underlying the Plaintiff's causes of action and raises seven affirmative defenses. The Court shall discuss the Plaintiff's claims seriatim.

**3.** The Plaintiff had purchased the insurance for his new truck through the Defendant's third-party insurance provider.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)).

A dispute concerning a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the moving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

**4.** If a charge filed with the CHRO is also covered under federal law, the CHRO "dual files" with the EEOC to protect federal rights. The charge usually will be retained by the CHRO for handling.

## B. TITLE VII AND CFEPA DISCRIMINATION/RE-TALIATION

■ Title VII directs that it is "unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a). Similarly, CFEPA directs that it is unlawful "[f]or an employer ... to discriminate against [an] individual in compensation or in terms, conditions or privileges of employment because of the individual's race [or] color...." Conn. Gen.Stat. § 46a–60(a)(1). Title VII and CFEPA also prohibit retaliation against those who exercise rights protected by the statute. *See* 42 U.S.C. § 2000e–3(a); Conn. Gen.Stat. § 46a–60(a)(4).[5]

### 1. Time Bar/Statute of Limitations

■ The Defendant first argues that the Plaintiff's Title VII and CFEPA claims are untimely. "An individual wishing to challenge an employment practice under [Title VII] must first file a charge with the [Equal Employment Opportunity Commission]." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 127 S.Ct. 2162, 2166, 167 L.Ed.2d 982 (2007). "Such a charge must be filed within a specified period...." *Id.* "This requirement functions as a statute of limitations, ... in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court...." *Quinn v. Green Tree Credit*

*Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (internal citations omitted); *see Ledbetter,* 127 S.Ct. at 2166–67 ("[I]f the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court....")

In general, Title VII discrimination claims must be filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). If, however, a claimant has filed a charge of discrimination in a state or locality that has its own anti-discrimination laws and enforcement agency, the time period for filing claims with the EEOC is extended to 300 days from the date of the unlawful practice. *Id.*; *see Edelman v. Lynchburg Coll.*, 535 U.S. 106, 109 n. 1, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002); *Quinn*, 159 F.3d at 765. Connecticut has its own anti-discrimination agency, the CHRO, with which the Plaintiff filed a discrimination charge. Thus, the 300–day limitation applies to the Plaintiff's claims here.

■ The Defendant relies on *Ledbetter* for the proposition that because the Plaintiff testified in his deposition that he was aware his route was inferior "from day one," his Title VII and CFEPA claims are untimely. The Plaintiff filed his CHRO charge on July 21, 2005, making the 300–day cutoff date September 24, 2004. The Plaintiff's first day of work with the Defendant was September 21, 2004, leaving a difference of three days between the Plain-

---

**5.** The Connecticut Supreme Court looks to "federal precedent concerning employment discrimination for guidance in enforcing [its] own antidiscrimination statutes." *Levy v. Comm'n of Human Rights and Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996); *see Brittell v. Dep't of Corr.*, 247 Conn. 148, 164, 717 A.2d 1254 (1998) ("In defining the con-

tours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII or the Civil Rights Act of 1964, the federal statutory counterpart to § 46a–60."). Therefore, the Court will discuss the Title VII and CFEPA claims together.

tiff's first day of work and the cutoff date. According to the Defendant, the Court should take the language "from day one" literally and use September 21, 2004 as the date from which the limitations period should toll. This would make the Plaintiff's Title VII and CFEPA claims untimely by three days.

The Court rejects the Defendant's argument here. To begin with, the expression "from day one" is not necessarily to be taken literally, but can simply mean "from the beginning." More to the point, however, the Plaintiff, after testifying that "from day one" he was aware of his inferior routes, specifies September 27, 2004 as the date he became aware that he was being assigned these inferior routes. (*See* dkt. # 60, Ex. B, DeSouza Depo. at 254.) This date falls within the 300–day time period.

■ Moreover, even if the Court were to use September 21, 2004 date as the Defendant wishes, the Plaintiff's claims would not be untimely. In *Ledbetter*, the Supreme Court stated that "if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed." *Id.* at 2169. The Plaintiff contends that, for the duration of his employment with the Defendant, the Defendant continually discriminated against him by assigning him inferior routes. In the Court's view, such assignments would constitute a fresh violation each time they occurred. Because most of these assignments occurred after the 300–day cutoff date of September 24, 2004 (as did the deactivation of the Plaintiff's driving contract and the Plaintiff's problems with the Defendant regarding the purchase of a new truck), the Plaintiff's Title VII and CFEPA claims are timely.

**2. Independent Contractor or Employee**

■ Next, the Court must determine what type of relationship existed between the Plaintiff and Defendant. The Defendant argues that the Plaintiff was not its employee, and thus the Plaintiff's Title VII and CFEPA claims fail. The Plaintiff argues that his relationship with the Defendant was that of an employee.

■ "Title VII ... cover[s] 'employees,' not independent contractors." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir.2000); *see O'Connor v. Davis*, 126 F.3d 112, 114–115 (2d Cir.1997)(upholding the district court's ruling that an intern was not an "employee" within the scope of Title VII). "The definition of the term 'employee' provided in Title VII is circular: the Act states only that an 'employee' is an 'individual employed by an employer.'" *O'Connor*, 126 F.3d at 115 (quoting 42 U.S.C. § 2000e(f)).[6] "However, it is well established that when Congress uses the term 'employee' without defining it with precision, courts should presume that Congress had in mind 'the conventional master-servant relationship as understood by the common-law agency doctrine.'" *Id.* (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)).

The Second Circuit, following *Darden*, adopted the common law agency test in *Frankel v. Bally, Inc.*, 987 F.2d 86 (2d Cir.1993). The traditional test arises out of the common law of agency and focuses primarily on the "hiring party's right to control the manner and means by which the product is accomplished." *Frankel*, 987 F.2d at 89. *Frankel* adopted the so-called "*Reid* factors" as a non-exhaustive

**6.** The relevant portion of CFEPA's definition of an "employee" is identical. *See* Conn. Gen.Stat. § 46a–51(9).

list of determinates to be considered in determining one's employment status. These factors are

'the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.'

*Frankel*, 987 F.2d at 89 (quoting *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). There is no shorthand formula that can be used to determine the employment status of a hired party. *Frankel*, 987 F.2d at 90. The Second Circuit has recognized, however, that although no one factor is dispositive, extra weight should be placed on the extent to which the hiring party controls the "manner and means" by which the hired party completes his task. *Eisenberg*, 237 F.3d at 117.

■ The Court begins by noting that the contract between the Plaintiff and Defendant, titled "Agreement for Leased Equipment and Independent Contractor Services," expressly states that the Plaintiff would be considered an "independent business person" who would not be considered "an employee[ ] of [the Defendant] or of [the Defendant's] customers at any time, under any circumstances, for any purpose whatsoever...." (Dkt. # 60, Ex. B, Attachment 14.) The contract goes on to state that the Plaintiff "shall exercise independent discretion and judgment to determine the method, manner and means of

performance of [his] contractual obligations[,] ...." but that the Defendant "shall ... issue reasonable and lawful instructions regarding the results to be accomplished by" the Plaintiff. (*Id.*) Such contractual language is not necessarily dispositive, for the parties' actions might not conform to the contract. Nevertheless, the Court notes that contractual language "fixing the relationship between [the Plaintiff and the Defendant], although not dispositive, provides strong evidence of the parties' intentions." *Taracido v. United States*, 93 Civ. 8266(LLS), 94 Civ. 3062(LLS), 1995 WL 217525, at *2 (S.D.N.Y. April 12, 1995). In any event, the Court analyze the status of the Plaintiff's employment using the *Reid* factors.

a. Control Over the Plaintiff's Work (Manner and Means)

■ The Defendant claims that the Plaintiff exercised discretionary control over the manner and means by which he provided driving services. The Defendant points out that after the Plaintiff was given a driving assignment it was up to him to determine a driving route, schedule breaks, and realize a profit from his driving. The Plaintiff rebuts by asserting that he was required (1) to be at the Defendant's facility at the same time everyday, (2) to wear a uniform, (3) to have a logo on his truck, (4) to return to deliver paperwork following a delivery, and (5) to remain at the Defendant's facility until at least 4:00 p.m. if his assignments were completed before then.

The Court agrees with the Defendant in that the substance of the Plaintiff's work was done independently. There is no dispute that, after being given an assignment, the Plaintiff determined his own driving routes, scheduled his own breaks, and realized a profit from his driving. These were the substantive components of the Plain-

tiff's work with the Defendant. Some of above-mentioned impositions mentioned by the Plaintiff, such as wearing a uniform, having a logo on his truck, or providing paperwork to the Defendant, were ancillary to his independent driving, and the imposition timetables and schedules does not strip an independent contractor of his status. Additionally, under the contract, the Plaintiff was permitted to use his truck for "non-EGL use," meaning that he could perform similar work for other companies. Thus, in the Court's view, the manner and means factor weighs in favor of finding that the Plaintiff was an independent contractor.

### b. Skill Required

The Plaintiff admits that there is a certain level of skill needed to perform the work he does. The Plaintiff also acknowledges that, for type of work he does, he must have a commercial driver's license. To obtain this license, the Plaintiff had to participate in a special driving course and passing a test. Although the Court does not deem the skill required for the Plaintiff's work to be unusually high, it nevertheless requires training and calls for the exercise of independent judgment. *See, e.g., Wadler v. E. College Ath. Conf.*, No. 00 Civ. 5671(JSM), 2003 WL 21961119, at *3 (S.D.N.Y.2003) (holding that a baseball umpire is a skilled worker "whose job performance requires training and the exercise of independent judgment"). Thus, this factor weighs in favor of finding that the Plaintiff was an independent contractor.

### c. Source of the Instrumentalities and Tools

There is no dispute that the Defendant did not provide the Plaintiff with a truck, and that the Plaintiff owned the truck he used in performing his driving assignments. The Plaintiff also used his own tools, such as gloves and a pallet jack, in order to move cargo in and around his truck. Because the Plaintiff, not the Defendant, was responsible for providing the proper tools for work, this factor weighs in favor of finding that the Plaintiff was an independent contractor.

### d. Location of the Work

The Defendant argues that, due to the nature of driving itself, the Plaintiff performed all of his work off of the Defendant's premises. The Plaintiff's affidavit makes it clear that he had to go to the Defendant's facility to receive driving assignments and return following their completion to hand in paperwork. (Dkt. # 74, ¶¶ 6 and 11.) The affidavit also states that even if a route is finished early, drivers are told to remain at the Defendant's facility until 4:00 p.m. (*Id.* at ¶ 11.) Considering the substance of the Plaintiff's work was done off the Defendant's premises, but he did have to report to the Defendant's premises, the Court finds that this factor "do[es] not meaningfully cut in favor of either the conclusion that the worker [was] an employee or the conclusion that he ... [was] an independent contractor." *Eisenberg*, 237 F.3d at 114.

### e. Duration of the Relationship

The Plaintiff began driving for the Defendant in September 2004 under a one-year contract, which was renewable for successive one-year terms. In the Court's view, this factor weighs in favor of finding that the Plaintiff was an independent contractor. *Clesi v. Zinc Corp.*, No. 5:01–CV–374, 2001 WL 1223456, at *4 (N.D.N.Y. Oct. 11, 2001) (holding that even though the relationship lasted over a six year period, the year-to-year contracts between the parties weighed in favor of independent contractor).

### f. Hiring Party's Right to Assign Additional Projects

The Defendant argues that it had no right to assign the Plaintiff additional pro-

jects in addition to what he was paid for. The Plaintiff contests that he had to remain at the facility until at least 4:00 p.m. every working day. Even if, however, the Defendant requested the Plaintiff to remain at the facility until 4:00 p.m., the Defendant never paid the Plaintiff for the time, nor was it his contractual obligation to remain there. In addition, the Court fails to see how simply remaining at the Defendant's facility, without more, could constitute an "additional project" that he was required to undertake. This factor weighs in favor of finding that the Plaintiff was an independent contractor.

### g. Hiring Party's Discretion Over When and How Long to Work

The Defendant argues the Plaintiff exercised his right to reject dispatches at his discretion and negotiated with the dispatcher for jobs he felt did not pay enough. Furthermore, the Defendant argues that the Plaintiff decided when and how often to take a break or eat a meal. The Plaintiff contends that he was told to be at the Defendant's facility at the same time each day, and if he was late he would be scolded.

The Plaintiff's contention here, though, is not persuasive. Even independent contractors, although "independent" in name, are required to keep to a schedule. The fact that an independent contractor is required to be at a job or at a facility at a certain time does not eliminate his status as an independent contractor. In the Court's view, the Defendant has not demonstrated that he did not have discretion over when and how long to work.[7] Thus, this factor weighs in favor of finding that the Plaintiff was an independent contractor.

### h. Method of Payment

The Defendant paid the Plaintiff by an "on the job" basis. The Plaintiff admits that he was not paid a salary nor was he paid by the hour. This factor weighs in favor of finding that the Plaintiff was an independent contractor.

### i. Hired Party's Role in Hiring and Paying Assistants

Under the terms of his contract with the Defendant, the Plaintiff could hire help in assisting him in his driving assignments. These assistants would be his employees or agents exclusively, and the Defendant was not responsible for paying them. The Plaintiff admitted in his deposition testimony that, although he rarely did so, he was free to hire such help. Thus, this factor weighs in favor of finding that the Plaintiff was an independent contractor.

### j. The Defendant's Business

The Defendant does not argue that the Plaintiff's job as a driver was not a part of the Defendant's regular business nor that the Defendant itself is a business. In fact, in its memorandum in support of summary judgment, the Defendant states that it "is a leading provider of freight transportation services, logistics management and information technology, having over 400 offices and agents in more than 100 countries worldwide." (Dkt. # 58, p. 4.) This factor weighs in favor of the Plaintiff.

### k. Employee Benefits and Tax Treatment of Hired Party

The parties agree that the Plaintiff was not entitled to any employee benefits, and that the Defendant issued him an IRS 1099 tax document, making him responsible for paying his own income taxes and Social Security taxes. This factor weighs

---

7. In fact, the record shows that the Plaintiff's work schedule was not regular, i.e., that he did not work a set amount of days a week or weeks a month.

in favor of finding that the Plaintiff was an independent contractor.

After a review of the facts that the parties submitted, the Court concludes that the Plaintiff was an independent contractor. In addition to the above-discussed *"Reid* Factors," most of which weigh in favor of the Defendant's argument, the parties entered into a contract clearly stating that the Plaintiff was an independent contractor. The Court is convinced, then, that the Plaintiff was an independent contractor, not an employee.

The relevant substantive anti-discrimination provisions of Title VII and CFEPA, *see* 42 U.S.C. § 2000e–2(a); Conn. Gen. Stat. § 46a–60(a)(1), and the relevant anti-retaliation provision of Title VII, *see* 42 U.S.C.A. § 2000e–3, apply to employers only. Because the Plaintiff worked as an independent contractor for the Defendant, the Defendant cannot be considered his employer. Thus, the Plaintiff is not entitled to relief under Title VII or CFEPA for race-based discrimination, nor is he entitled to relief under Title VII for retaliation. Therefore, with regard to the

Plaintiff's Title VII and CFEPA discrimination claims, and the Plaintiff's Title VII retaliation claim, the Defendant's motion for summary judgment **(dkt. # 58)** is **GRANTED.**[8]

### C. 42 U.S.C. § 1981

The Plaintiff also alleges that the Defendant's conduct violated 42 U.S.C. § 1981. Section 1981(a) reads as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

 To establish an action under 42 U.S.C. § 1981, a plaintiff must show that: (1) he is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimina-

---

8. The Plaintiff's CFEPA retaliation claim, however, is another matter. The relevant provision of CFEPA makes it unlawful for "any *person* ... to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding [under CFEPA's discriminatory practice procedures]." Conn. Gen. Stat. § 46a–60(a)(4) (emphasis added). For the purposes of CFEPA, a "person" is defined as "one or more individuals, partnerships, associations, corporations, limited liability companies, legal representatives, trustees, trustees in bankruptcy, receivers and the state and all political subdivisions and agencies thereof[.]" Conn. Gen.Stat. § 46a–51(14). Based on this statutory language, it appears that the anti-retaliation provision of CFEPA is not limited to employers. *See Perodeau v. City of Hartford*, 259 Conn. 729, 737–38, 792 A.2d 752 (2002) ("[W]e note that when the

legislature has intended for the provisions of the Fair Employment Practices Act to apply to persons other than employers, it has made its intention clear. For example, in [the anti-retaliation provision,] § 46a–60(a)(4), ... by contrast to § 46a–60(a)(1), the legislature specifically referred to persons as well as to employers.") (footnote omitted); *cf. Wasik v. Stevens Lincoln–Mercury, Inc.*, No. CIV. 3:98CV1083 (DJS), 2000 WL 306048, at *6 (D.Conn. Mar. 20, 2000). This divergence between Connecticut and federal anti-discrimination law is not totally strange, for "under certain circumstances, federal law defines the beginning and not the end of our approach to the subject." *State v. Comm'n On Human Rights and Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989) (internal quotation marks omitted). Thus, in the Court's view, the Plaintiff's CFEPA retaliation claim does not fail because he was an independent contractor.

tion concerned one of the statute's enumerated activities. *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir.2000).[9] The enumerated activity implicated in this case is the right to "make and enforce contracts." Racial discrimination concerning employment contracts is within the purview of § 1981. *Baker v. McDonald's Corp.,* 686 F.Supp. 1474, 1481 (S.D.Fl.1987) (*quoting Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)).

▬ "A plaintiff's efforts to establish the second element of a § 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII...." *Jenkins v. NYC Transit Auth.,* 201 Fed.Appx. 44, 45–46 (2d Cir.2006) (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 146 (2d Cir.1999)). In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the burden-shifting framework for analyzing employment discrimination claims in the absence of direct evidence:

> The complainant ... must carry the initial burden under the statute of establishing a prima facie case of racial discrimination.... The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse action].... [The plaintiff must then] be afforded a fair opportunity to show that [a defendant's] stated reason for [the adverse action] was in fact pretext.

*Id.* at 802–04, 93 S.Ct. 1817; *see Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

1. Prima Facie Case

▬ "In order to establish a prima facie case of discriminat[ion] ... in violation of ... § 1981, a plaintiff must show (1) that he belongs to a protected class, (2) that he was performing his duties satisfactorily, (3) that he [suffered an adverse action], and (4) that [the adverse action] occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class." *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir. 1997). The parties stipulate that the Plaintiff has satisfied the first and second elements of the prime facie case.

▬ The Court also finds that the Plaintiff has satisfied the third element of the prima facie case. The Plaintiff, in his deposition, stated that his contract claims were based on not being given a thirty day written notice before being deactivated. Additionally, in his opposition memorandum, the Plaintiff maintains that his § 1981 employment discrimination claim is for disparate treatment and wrongful termination, and contends that the Defendant treated him differently than similarly-situated white people, namely, that the Defendant gave him inferior, lower paying driving routes and that he was offered fewer opportunities to drive any routes in comparison to other drivers. Moreover, the Plaintiff argues his contract with the Defendant was terminated because he complained of this disparate treatment. Based on the above, the Court believes that the Plaintiff has satisfied the third prong of his prima facie case.

With regard to the fourth prong of the prima facie case, i.e., that the adverse employment action occurred under circumstances giving rise to an inference of discrimination, the Plaintiff relies heavily on

---

9. There is no dispute that the Plaintiff is a member of a racial minority. Thus, the Plain- tiff has established the first element of a § 1981 claim.

his own affidavit and deposition for evidence of intentional discrimination. The Defendant, for its part, argues that the evidence submitted by the Plaintiff does not satisfy this fourth prong. The Court shall address the parties arguments in turn.

### a. Route Assignment & Pay Discrimination

■ In his response in opposition to summary judgment, the Plaintiff relies on his affidavit and exhibits J, Q, and W to prove claims that the Defendant assigned him inferior routes and provided him with less pay than afforded to white drivers. Exhibit Q contains certain driving logs for the Plaintiff, and exhibit W contains certain driving logs for three white drivers, Jeff Harris ("Harris"), Shane LaFontaine ("LaFontaine"), and Peter Barnum ("Barnum"), all of whom drove for the Defendant. These logs are handwritten and often difficult to read. The Plaintiff nevertheless submits these driving logs to demonstrate that the Defendant assigned to him routes that took him outside of Connecticut, but did not do the same for Harris, LaFontaine, or Barnum. The Court begins by noting that many of these logs, including the Plaintiff's own logs, do not always specify the location for a delivery, but instead name the company or person to whom the shipment

was made. Indeed, Barnum's logs hardly ever specify a delivery location. The fact that these locations are not known undercuts the Plaintiff's use of these logs to support his position that he was given out-of-state routes.

In any event, from what the Court can discern from the driving logs, any contention that Barnum, LaFontaine, or Harris did not have to travel out of Connecticut is simply untrue. For example, Barnum's logs frequently indicate that he drove to "UMass," presumably the University of Massachusetts, which is not located in Connecticut. Barnum's logs also refer to deliveries made to "Ludlow Tech.," which would also appear to be a Massachusetts location. LaFontaine's logs likewise indicate deliveries made outside of Connecticut; he appears to have made deliveries to "Ebtec" in "Agawam," (presumably Agawam, Massachusetts), and to "Hasbro" in "E. Longmeadow" (presumably East Longmeadow, Massachusetts). Harris's logs, too, indicate that he made deliveries to "Hasbro" in "E. Longmeadow."[10] From all appearances, then, it seems that white drivers were sent out of Connecticut.[11]

The Plaintiff specifically argues, though, that not one of these three drivers, nor any of the Defendant's other white drivers, was

10. Barnum's logs contain many instances where he made trips to "Hasbro." In these logs, however, Barnum did not indicate where this "Hasbro" was located. It would not be beyond the realm of possibility that this is the same "Hasbro" referenced in LaFontaine's and Harris's logs. The Court cannot say with absolute certainty, however, that this is true because the record is not entirely clear on this point.

11. The Plaintiff uses the terms "local," "non-local," and "far away" when describing driving routes. The court assumes that the Plaintiff intends the Defendant's facility in Hartford, Connecticut to be the point of reference

when he uses these terms. He does not, however, define what is (or what he considers to be) "local" or "non-local" to Hartford. It is clear that he does not consider his New York City routes to be "local" routes. It is not clear, however, whether the Plaintiff considers, for example, a "UMass" route to be local or non-local. To the Court's knowledge, the branch of the University of Massachusetts that is closest to Hartford is located in Amherst, Massachusetts. Depending on one's starting and ending points, the distance between Hartford and Amherst is between fifty and sixty miles. The Court fails to see how this would qualify as "local" to Hartford.

ever assigned routes that took them to New York.[12] The record does not support such a broad assertion. The Plaintiff cites to the deposition of Mark Hanrahan ("Hanrahan"), the Defendant's dispatcher, for the proposition that white "straight truck drivers" were not sent to New York City. Hanrahan does not, however, say this. Hanrahan testified that he did not think that LaFontaine had to drive to New York City; as for Harris and Barnum, Hanrahan was not sure. (Dkt. # 75, Ex. K, Hanrahan Depo. at 57–61, 77.) This is hardly an admission that only black drivers were assigned New York routes.

Moreover, Exhibit Q contains the Plaintiff's driving logs from September 27, 2004 to October 29, 2004, and Exhibit W contains LaFontaine's, Barnum's, and Harris's driving logs for approximately the same time period (late September 2004 to late October 2004). The Plaintiff's contract with the Defendant, though, was terminated in March 2005, and LaFontaine, Harris, and Barnum seemingly worked for the Defendant after October 2004.[13] The Court fails to see how cherry-picking one month's worth of driving logs is sufficient to show that white drivers had better routes, or did not have to travel to New York City, during the entirety of the Plaintiff's working relationship with the Defendant.

The Court also notes that the Plaintiff has not provided an adequate comparison for him to prevail on this point. It is undisputed that driving assignments varied day-to-day, depending on where and to whom a delivery was to be made. From what the Court can tell, it appears that the Plaintiff did not always work for the Defendant on all the working days available in the months he was with the Defendant. The Plaintiff has not demonstrated that he and those to whom he compares himself were always working, or available to work, on the same days (indeed, as noted above, he has not submitted the driving logs for the entirety of the relevant time period). Furthermore, as the Defendant points out, the Plaintiff drove a truck requiring a commercial driver's license, whereas LaFontaine and Barnum did not.[14] Absent such evidence showing that the Plaintiff and his comparators were similarly situated in all material respects, it would be difficult for a finder of fact to conclude that the white drivers received preferential routes over the Plaintiff. In short, with regard to his allegations about discrimination in the assignment of driving routes, the Court finds that the Plaintiff has not established a prima facie case.

Exhibit J is a list of monthly revenue settlements paid to all drivers. Although for several months the Plaintiff made less monthly than other similar drivers, it is impossible to run a fair mathematical analysis of the information because the Plaintiff has not provided any evidence of the number of days worked by similarly situated drivers. Without a comparison between the number of days worked by the Plaintiff and the number of days worked by other drivers, there is no way to formulate any objective conclusions from the evidence. In addition, the Defendant has

12. The Plaintiff specifically uses New York (or New York City) arguments, presumably because he himself had to drive there. The Plaintiff does not, though, explain how or why one out-of-state route than another, e.g., why would a driver prefer Massachusetts State or New York City routes.

13. The Plaintiff represents that Barnum stopped driving for the Defendant on November 12, 2004.

14. There were other white drivers for the Defendant, but they all seem to have driven cargo vans, not trucks, thus making a comparison between them and the Plaintiff irrelevant.

detailed which drivers on the list are black and which are white, and it appears that, for each month the Plaintiff drove for the Defendant, at least one (if not several) black drivers were the top earners. Furthermore, in one of these months, December 2004, the Plaintiff earned more than every white driver working for the Defendant, as did all but three of the other black drivers. Thus, with regard to his pay, the Plaintiff has failed to show that the Defendant discriminated against him.

### b. Deactivation of driving contract

#### i. Comparison of drivers

 The Plaintiff argues that the Defendant discriminated against him when it deactivated his contract. To demonstrate this, the Plaintiff points to how the Defendant treated other drivers. According to the Plaintiff, the Defendant treated him differently from white drivers when it came to truck compliance. That is, he claims that the Defendant did not require white drivers to replace their trucks, while the Defendant terminated his contract for failure to upgrade his truck.

What the Plaintiff ignores is that these drivers did not have similar situations to the Plaintiff given their working dates or truck age. One of the drivers to whom the Plaintiff compares himself had stopped driving for the Defendant before the Plaintiff even began working for the Defendant. The Plaintiff also submits a document apparently showing that Harris drove a 1996 truck from 2000 to 2003. (*See* dkt. # 75, Ex. U.) Even if the Court were to accept that this document definitively shows that from 2000 to 2003 Harris drove a 1996 truck for the Defendant, this fact would

not provide a relevant basis for comparison. To start, the Plaintiff did not even begin to work for the defendant until late September 2004, i.e., the time frame in Exhibit U is different from the relevant time period in this case. In addition, Harris's truck would have only been four years old when it became active in 2000. It was seven years old when it became inactive in 2003. The Plaintiff's truck, on the other hand, was a 1995 model, meaning not only that it the was older than Harris's truck, but also that it was already nine years old when Plaintiff began driving for the Defendant. That is, Harris's truck was four years old when it became active (and seven years old when it became inactive), whereas the Plaintiff's truck was nine years old when it became active. The Court fails to see how a comparison between the Plaintiff, with his 1995 truck, and Harris, with his 1996 truck, is relevant.

The Plaintiff also compares himself to another driver, Huron Howard ("Howard"), who began working for the Defendant in 2003 and had a 1998 truck. Again, however, the comparison does not seem entirely relevant here, as Howard's truck was three years younger than the Plaintiff's, and was five years old when Howard began working for the Defendant. More to the point, though, is the fact that the Plaintiff does not claim that Howard was white, and from what the Court can tell, it appears that Howard was, in fact, not white.[15] The Court fails to see how this comparison is useful to the Plaintiff's allegations of race discrimination.

In addition to his attempt to compare himself to specific drivers, the Plaintiff

---

**15.** Indeed, the Plaintiff, in his memorandum of law, stated that "Howard had never made a complaint of race discrimination" (dkt. # 75, Part II ¶ 5), implying that he had cause to complain about his treatment by white supervisors. Moreover, although the submit-

ted revenue statements list a "Howard Trucking," but not a "Huron Howard," it appears from the parties' submissions that the owner/operator of Howard Trucking was black, and that Huron Howard was the owner/operator of Howard Trucking.

references an internal memorandum distributed by the Defendant that granted extensions of time for some drivers to replace their older model trucks. (*See id.,* Ex. V.) The memorandum, dated November 29, 2005, granted extensions only to drivers who had trucks from model year 1999 or later. The relevance of this memorandum escapes the Court. Again, the Plaintiff ignores that he was driving a 1995 truck, which was older than the trucks covered by the memorandum. Additionally, this memorandum is dated November 29, 2005, months after the Plaintiff stopped driving for the Defendant. This "very flexible" policy (as the Plaintiff calls it) regarding the age of the drivers' vehicles, as established by this memorandum, was not even in place when the Plaintiff drove for the Defendant.

Even if this policy had been in place during that time, it does not, as the Plaintiff argues, show that the Defendant enforced vehicle age policies more strictly against him than against other drivers. At most, it shows that the Defendant was more lenient toward drivers with 1999 (or newer) trucks, not that the Defendant harbored racial animus.[16] Given the changes in technology and safety standards, it is not unreasonable for a company in the Defendant's business to prefer newer trucks to older ones, and to require that older trucks be replaced more quickly. To show that the Defendant, in implementing its vehicle age policies, discriminated against the Plaintiff, the Plaintiff would need to show that the Defendant was more lenient toward another driver with a truck that was at least as old as the Plaintiff's. There is no such evidence in the record. Therefore, the Plaintiff has failed to estab-

lish, through a comparison of himself to other drivers, that the termination of his contract occurred in circumstances giving rise to an inference of discrimination on the basis of his race.

### ii. Racial complaints

The Plaintiff argues that he was denied work for three days after making a complaint about race, and that his contract was ultimately deactivated because of his race complaints. The Court finds that, taking the undisputed facts and resolving the disputed facts in favor of the Plaintiff, there is no basis for a cause of action. The Plaintiff relies on his own affidavit and driver manifests to support his claims but his deposition nulls his complaints. As the Defendant correctly points out, the Plaintiff did not mention race when he complained to Sweet about the allegedly lower paying routes. Although it may be true that Sweet stated that the Plaintiff may have been "playing the race card," the Plaintiff explicitly explained he had not referenced race.[17] (*See* dkt. # 60, Ex. B, DeSouza Depo. at 299.)

The Plaintiff also relies on support from a "protest letter" which is dated "3/17/05." (Dkt. # 75, Ex. P.) In the letter, the Plaintiff indicated that he was going to stay home (i.e., not show up for work) in protest of the fact that he was not given favorable loads or routes. Nonetheless, the Court, after reviewing of this letter, finds no reference therein to race or race discrimination. Therefore, this protest letter is of little help to the Plaintiff.

This leaves, then, the incident where the Plaintiff was sent home for refusing a load, and the time when the Plaintiff allegedly complained about racial discrimination

16. The Court points out that some of the drivers receiving extensions pursuant to the memorandum were black.

17. The Plaintiff stated that when Sweet brought up race, he replied in response: "Richard, I haven't mentioned race." (Dkt. # 60, Ex. B, DeSouza Depo. at 299.)

during purported driver meetings that possibly took place in November 2004 or January 2005. With regard to being sent home for refusing a load, the Plaintiff alleges that in late October 2004, he refused to accept a load, which he was permitted to do under his contract; according to the Plaintiff, he complained that white drivers got better loads and routes, and, in response, he was sent home. The Court does not see how this one incident in October 2004 demonstrates that the Defendant violated § 1981 by deactivating the Plaintiff's contract approximately five months later in March 2005.

Finally, there is the time when the Plaintiff allegedly complained about racial discrimination during purported driver meetings. During those meeting, the Plaintiff claims that "the black people . . . [questioned] how come the white people don't go to New York and they don't get retaliated against." (Dkt. # 60, Ex. B, DeSouza Depo. at 301.) The Plaintiff contends he spoke up with other "black people." There is no evidence, however, as to what he himself specifically said during these meetings. Upon reading the Plaintiff's deposition, it is not even clear if the Plaintiff spoke at all during these meetings. The Plaintiff refers to "the drivers" speaking, but complaints from other drivers are insufficient to support his § 1981 claim.

Even if the Court were to assume that the Plaintiff did make clear, definite statements during these meetings, and that these statements concerned racial discrimination, the record demonstrates that the Plaintiff was given a second extension to update his vehicle either after he already missed the January 1, 2005 deadline to do so, or closely around the deadline. His contract was not deactivated after the driver meetings. This fact thus undercuts an inference of discrimination or retalia-

tion. In addition, the Plaintiff's last day of work was after the second extension expired, demonstrating that the Defendant was not in a rush to terminate the contract as soon as possible. In the Court's view, the Plaintiff has not established that the termination of his contract occurred in circumstances giving rise to an inference of racial discrimination. Therefore, the Plaintiff has failed to pass the forth prong of a prima facie case.

### 2. Legitimate, Nondiscriminatory Reason

 Even if the Plaintiff could produce a prima facie case of discrimination, the Defendant has proffered several legitimate reasons why the Plaintiff was possibly given less desirable routes and why his contract was "inactivated." The Defendant contends that route assignments were given out with respect to: (1) safety concerns; (2) the relative convenience and comfort level of customers; (3) a driver's familiarity with a particular driving area; (4) the size of a driver's vehicle; (5) a driver's familiarity with particular customers; and (6) the relative reliability, attitude, and diligence of a driver. As to the termination of the Plaintiff's contract, the Defendant stated that it "inactivated" the Plaintiff's contract because he did not purchase a compliant truck, which he agreed to do when he began working for the Defendant. In addition, the Defendant points out that the Plaintiff was given multiple written extensions to purchase a compliant truck, more than any other driver at the Defendant's Hartford facility. In light of the above, the Defendant has satisfied the second prong of the *McDonnell Douglas* framework.

### 3. Pretext

Assuming that the Plaintiff's prima facie case did not fail, the Plaintiff would not be able to satisfy the third prong of the

*McDonnell Douglas* framework. Quite simply, the Plaintiff has not established that the Defendant's proffered reasons for its claimed actions were pretext. Other than providing the Court with his own opinion, the Plaintiff has not shown that any of the above-listed considerations regarding route assignments are untrue. With regard to the deactivation of the Plaintiff's contract, the record shows that: (1) when the Plaintiff began driving for the Defendant, he was aware that he needed to obtain a compliant truck; (2) the Defendant gave the Plaintiff two extensions of time to obtain a compliant truck, more than what was given to other drivers;[18] (3) other drivers were also required to obtain compliant trucks; and (4) despite these extensions, the Plaintiff had not obtained a compliant truck. In the Court's view, then, the Plaintiff has failed to establish that the Defendant intended to discriminate on the basis of race, which is the second element of a § 1981 claim. Consequently, with regard to the Plaintiff's § 1981 claim, the Defendant's motion for summary judgment (**dkt. #58**) is **GRANTED.**

### D. CFEPA RETALIATION/BREACH OF CONTRACT/PROMISSORY ESTOPPEL

The Court has granted summary judgment on all the federal claims alleged by the Plaintiff. This leaves only the CFEPA retaliation, breach of contract, and promissory estoppel claims, all of which are based upon Connecticut law. "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Castellano v. Bd. of Trs. of the Police Officers' Variable Supplements Fund*, 937 F.2d 752,

758 (2d Cir.1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). "If it appears that the federal claims ... could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir.1974). This court thus declines to assert supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under ... if the district court has dismissed all claims over which it has original jurisdiction."). Because the Plaintiff's federal claims have been disposed of on a motion for summary judgment, his remaining claims under Connecticut law are hereby **DISMISSED without prejudice to the Plaintiff bringing those claims in state court.**

### IV. CONCLUSION

For foregoing reasons: (1) the Defendant's motion to strike (**dkt. #77**) is **DENIED**; (2) the Defendant's motion for summary judgment (**dkt. #58**) is **GRANTED with respect to the Plaintiff's federal claims and CFEPA discrimination claim. Judgment in favor of EGL Eagle Global Logistics LP shall enter on the First Count (Title VII), the Second Count (Section 1981), and the race discrimination claim of the Third Count (CFEPA);** and (3) the Court declines to exercise supplemental jurisdiction over the remaining claims under Connecticut law. **Thus, the retaliation claim in the Third Count (CFEPA), the Fourth Count (Breach of Contract), and the Fifth Count (Promissory Estoppel) are**

---

18. The Defendant submitted evidence, which the Plaintiff did not rebut, establishing that the Plaintiff received more extensions of time than any other of the Defendant's drivers.

DISMISSED without prejudice to the Plaintiff bringing those claims in state court. The claims against defendant Richard Sweet had previously been withdrawn. Therefore, the clerk shall close this file.